UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-22782-cv-MGC

BENJAMIN FERNANDEZ, GUSTAVO
MARTINEZ, OSCAR LUZURIAGA, and
DANIEL ARAUJO as trustees of and on
behalf of the LAAD RETIREMENT PLAN,
and as trustees of and on behalf of the
LAAD CORPORATION S.A. MONEY
PURCHASE RETIREMENT PLAN, and on
behalf of all others similarly situated,

       Plaintiffs,

v.

MERRILL LYNCH, PIERCE,
FENNER & SMITH INCORPORATED,

       Defendant.

_____/

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

Plaintiffs, individually and on behalf of all others similarly situated, reply in support of their motion to certify a class against Defendant, and state:

### I.     INTRODUCTION

Merrill's misconduct is not disputed, making this case somewhat unique.[1] Thus, the grounds for Plaintiffs' Motion for Class Certification (the "Motion") consist almost exclusively of facts that Merrill either admitted in its 2014 FINRA AWC Letter or cannot reasonably dispute. So in its opposition to the Motion (the "Response"), Merrill takes a different approach. It argues that its wrongdoing was so large, and affected so many, that it is too complicated to sort out and cannot reasonably be addressed on a class basis.

But as explained below, that is not true. A class *can* be ascertained and common questions *do* predominate over individualized issues. And to the extent there is any question about that, Merrill must first produce the documents and witnesses requested by Plaintiffs that go to these issues. As described below, recent developments suggest that Merrill

---

[1]     Merrill primarily makes the legal argument that it did not have a fiduciary duty — an argument that Judge Cooke preliminarily rejected at the dismissal stage. [D.E. 49].

and/or its counsel now realizes that Merrill has a problem, and so Merrill refuses to relinquish further information until it gets a handle internally on the extent of that problem.

As a threshold matter, Plaintiffs have standing to represent the Class. Eleventh Circuit precedent and more recent cases from other circuits hold that once a class representative establishes individual standing, its ability to represent the putative class depends not on an Article III analysis examining whether it suffered the same exact injury as the class, but whether it meets Rule 23's typicality requirement. The analysis focuses on the existence of a pattern, practice or common course of misconduct. Here, Merrill's conduct — failing to ensure that its small business retirement plan customers received sales charge discounts — similarly impacted Plaintiffs and the Class, regardless of the fact that the plans may have invested in different mixes of the 106 funds that Merrill offered. Factually, standing is established by the 2014 FINRA AWC Letter, *in which Merrill itself described how its conduct uniformly "disadvantaged" Plaintiffs and the other 28,802 putative class members.*[2]

In this way, the 2014 FINRA AWC Letter also provides "significant proof" of typicality. It shows that Plaintiffs and the Class are similarly situated and aggrieved by the same misconduct. If Plaintiffs prove that Merrill had a fiduciary duty, then Plaintiffs prove every Class member's case.

Merrill attacks typicality by acknowledging its admittedly insufficient remediation to Plaintiffs was caused by a series of "cascading" human errors that affected one of Plaintiffs' five accounts but not the accounts of the other 28,802 other plans. Despite the fact that, since June 2015, Plaintiffs' counsel has been asking Merrill to explain why Plaintiffs did not receive proper remediation, this "cascading errors" excuse was not communicated until just before Merrill filed its Response. Regardless, the cascading errors explanation fails to defeat typicality for at least two reasons. First, even if true it only explains why Merrill's

---

[2]     The harm that Merrill's inflated prices could cause to retirement savers is dramatic. An SEC bulletin entitled "Updated Investor Bulletin: How Fees and Expenses Affect Your Investment Portfolio" illustrates that a retiree who *invested $100,000*, averaged 4% annual investment returns over a 20-year period, and was charged an extra 0.75% in fees per year would have *almost $30,000 less* at the end of 20 years.

*remediation* payment to Plaintiffs fell short.  It does not address the other, potentially larger, issue — that Plaintiffs, like the other Class members they seek to represent, did not receive a *disgorgement of profits* as required by ERISA.  Plaintiffs' disgorgement claim is typical of the Class members regardless of any cascading errors Merrill may have made.

Second, Merrill's "cascading" errors explanation does not "hold water."  When information contained in LAAD's own account statements is plugged into the very formulas used by Merrill to calculate the remediation, the resulting dollar amounts that should have been refunded are significantly higher than those Merrill actually refunded to Plaintiffs.  In other words, the refunds to Plaintiffs, and likely to the Class, were short.  Moreover, the cascading errors theory affects *only one* of Plaintiffs' five accounts.  The series of calculation errors discovered by Plaintiffs *affect all five*.

During the one deposition that Merrill permitted, Plaintiffs presented this and other information to the corporate representative designated to testify about remediation, Melissa DeWolf.  DeWolf is a Merrill vice president and a co-author of the "Remediation Plan" that Merrill created and used to conduct the $89.2 million remediation.  When shown the difference between what the formula provided and what Plaintiffs actually received, DeWolf could not explain the refund discrepancy.  *And she acknowledged that Merrill did not fully remediate.*  Since that deposition two weeks ago, Merrill has not provided any explanation for the shortfall.  Instead, Merrill simply stopped participating in class discovery.  It refused to provide corporate witnesses on Plaintiffs' remaining 20 deposition topics and would not commit to timely providing even a random sampling of basic source documentation relating to other Class members' accounts.  As a result, Plaintiffs cannot definitively say that the calculation errors extend to other Class members' accounts.  But Merrill's tactics strongly suggest they do.  If the information held by Merrill could disprove the existence of problems in other accounts, Merrill would have provided it.

As to ascertainability of the class members and the existence of "individualized issues," Merrill's concerns are overblown.  Although Merrill has produced only 14 of the 106 relevant fund prospectuses, a majority of them contain no additional waiver eligibility

requirements other than being a retirement plan. This preliminary review of the limited prospectuses provided shows that, at the very least, there exists an easily ascertainable "Core Class" of plans that invested in such "No Requirements Funds." This Core Class fits precisely within the proposed class definition. And given the fact that most plans likely invested in at least one No Requirements Fund, the Core Class likely includes most of the 28,803 plans that Merrill admitted deserved remediation. All that is needed to identify this Core Class is Merrill's production of the remaining prospectuses so that a complete list of No Requirements Funds can be made and run against Merrill's account data. Every plan that invested in a No Requirements Fund would be a member of the Class.

Plans that invested in any funds that had additional eligibility requirements, such as a minimum of $1 million in plan assets or 100 employees (the "Eligibility Funds"), can either be dealt with in appropriate subclasses or as part of the damage calculation in a post-judgment claims administration process. For a plan within the Core Class that also invested in one or more Eligibility Funds, the question of whether the plan met those funds' eligibility requirements is a damages question. As explained in the preceding paragraph, the plan would already be identified as a member of the Class. The extent to which a plan possessed a certain amount of assets (information that Merrill keeps according to DeWolf) or certain number of employees (information that is contained in Merrill's account-opening documents) can be determined, either through a computerized formula (which is feasible according to Plaintiffs' quantitative analysis expert, Alan Spies) or through a claims submission process in which plans that invested in Eligibility Funds affirm their plan size and assets for the relevant period. To the extent that a particular plan is not in the Core Class, that plan could be determined to be part of a subclass of plans that invested only in the particular Eligibility Fund, using the same information. In sum, the damages issues presented by Merrill are not so insurmountable as to overcome the predominant issue in this case — whether Merrill, through the actions it describes in the 2014 FINRA AWC Letter, breached its fiduciary duty to a class of tens of thousands of retirement plan customers.

Finally, the profits that Merrill must disgorge to Plaintiffs and the Class are calculable. As set out below and in the Report by Plaintiff's expert, John J. Duval, the majority of the Class "A" upfront sales charges or Class "C" increased continuing charges (.75% per year) that Merrill improperly imposed upon its clients was pure profit. The amount of these profits can be readily calculated using data that Merrill has already collected and calculations that it has already made.

## II.   ARGUMENT

### A.   Plaintiffs Have Standing to Bring Their Class Claims

Under controlling precedent in this Circuit and elsewhere, Plaintiffs have standing to represent the other retirement benefits plans injured by Merrill's conduct.

#### 1.   Plaintiffs Have Individual Article III Standing

First, Plaintiffs have Article III standing, meaning a "'case or controversy' between [plaintiff] and the defendant within the meaning of Art. III." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Plaintiffs allege that Merrill breached its fiduciary duty by failing to inform mutual funds purchased by the LAAD Plans that LAAD was a retirement plan, thus depriving Plaintiffs of the sales charge waivers to which they were entitled and/or forcing the plan to purchase more expensive Class C shares. Further, it is undisputed that Merrill Lynch never disgorged profits earned through its misuse of Plan assets as required by ERISA. This satisfies the first prong (injury-in-fact) of the Supreme Court's Article III standing test. Because Merrill does not dispute that the second (causation) and third (redressability) prongs have been met, Plaintiffs' standing to bring an action against Merrill is conclusively established. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

#### 2.   Under Binding Eleventh Circuit Precedent, Plaintiffs Have Standing to Represent the Class

Plaintiffs also have standing to represent other similarly situated plans aggrieved by Merrill's conduct, even if the other plans purchased different mutual fund families. The pre-split Fifth Circuit considered this issue in *Cooper v. University of Texas at Dallas,* 648 F.2d 1039, 1039 (5th Cir. Unit A June 1981). The defendant argued — as Merrill does — that a

class representative only has standing to raise those class claims that it can assert individually. The district court rejected this argument, holding:

> [Defendant's] contention is overly broad and unsound. Its overbreadth stems from a confusion of the requirements of Article III and Rule 23 . . . . [A] class representative has standing if she alleges that she as an individual has suffered a concrete injury. If she passes this threshold constitutional test, then the next question whether she may represent the class members is not in the first instance one of standing. Instead, the court must first scrutinize the relationship between the representative and the class members to determine whether it satisfies the requirements of Rule 23.

482 F. Supp. 187, 191 (N.D. Tex. 1979). The Fifth Circuit affirmed, citing "the insightful and well-reasoned opinion of the district judge." *Cooper*, 648 F.2d at 1039.

The Eleventh Circuit has employed the same reasoning. In *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341 (11th Cir. 2001), the defendants argued that because an ERISA plan participant did not have individual standing to raise a breach of fiduciary duty claim for breaches that occurred before or after his participation in the plan, he could only represent a class comprised of members making claims for breaches that occurred during his participation period. *See id.* at 1350-51. The Eleventh Circuit disagreed, holding that "[e]ven though Piazza only has standing to assert this breach of fiduciary duty claim for the period of his participation in the Plan, he may still represent the class if his claim has the requisite typicality." *Id.* at 1351. The court also noted that beyond the requirement that a named plaintiff possess individual standing to raise *a* claim against the defendant — in *Piazza*, as in this case, the claim was for breach of fiduciary duty — "there is no similar requirement that 'all putative class members share identical claims.'" *Id.*

Merrill's standing argument fails under *Cooper* and *Piazza*, which are binding precedent. Plaintiffs have Article III standing and also are appropriate Rule 23 class representatives.

### 3.    Numerous Other Courts Have Found Standing in Similar Circumstances

Other courts considering similar challenges to class standing have concluded that plaintiffs such as LAAD Plan's trustees have standing to maintain a class action. In *Fallick v. Nationwide Mutual Insurance Co.*, 162 F.3d 410, 421 (6th Cir. 1998), the Sixth Circuit

reversed the district court's ruling that although the plaintiff possessed standing to assert claims under ERISA with respect to his own medical benefits plan, he lacked standing to represent participants in other benefit plans. The court ruled that "[o]nce his [individual] standing has been established, whether a plaintiff will be able to represent the putative class depends solely on whether he is able to meet the additional criteria encompassed in Rule 23 . . . ."[3] *Id.* at 423. Therefore, the plaintiff had standing to represent a class of other similarly situated plans "if the gravamen of the plaintiff's challenge *is to the general practices which affect all of the plans." Id.* at 422 (emphasis added).[4]

Here, Plaintiffs claim that Merrill breached its fiduciary duty to obtain sales charge waivers on behalf of small business retirement accounts — conduct that harmed all putative Class members. Any purported differences between class members' and Plaintiffs' claims (e.g., which specific mutual fund families were held by the various class members) should be considered as a component of this Court's "typicality" analysis under Rule 23, not through the lens of Article III.

In another similar case, *NECA-IBEW v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), the Second Circuit held that a purchaser of securities had class standing to bring claims on behalf of the buyers of other related securities where a single SEC Shelf Registration Statement, common to all purchasers of the subject securities, was rife with misstatements. The court applied a test for class standing in such circumstances:

> [A] plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as

---

[3]    The Sixth Circuit noted that the lower court's analysis missed the mark by "confus[ing] the issue of a plaintiff's standing under Article III vis-á-vis a defendant with the relationship between a potential class representative and absent class members." *Id.* at 422.

[4]    *See also Clancy v. The Bromley Tea Co.*, 308 F.R.D. 564, 571 (N.D. Cal. 2013) (citing *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007)) ("Transmogrifying typicality or commonality into an issue of standing would undermine the well-established principles that '[i]n a class action, standing is satisfied if at least one named plaintiff meets the requirements . . . ."); *Cardenas v. NBTY, Inc.*, 870 F. Supp. 2d 984, 991–92 (E.D. Cal. 2012) (finding that whether plaintiff could pursue claims for putative class members arising out of products the plaintiff did not purchase is a question of Rule 23, not Article III).

> the conduct alleged to have caused injury to other members of the putative
> class by the same defendants.  Therefore, the district court's requirement that
> NECA 'show[ ] that [its] injuries . . . are *the same* . . . as those allegedly
> suffered by purchasers of [Certificates from] outlying [T]rusts backed by
> distinct sets of loans' was error.

*Id.* at 161 (emphasis in original).  Like the Sixth Circuit, the Second Circuit's standing inquiry focuses on whether there is a common issue or course of alleged misconduct such that the class representative's and absent class members' interests align, not whether all class members suffered the exact same injury.[5]

Plaintiffs have satisfied the *NECA-IBEW* test for Article III class standing.  Plaintiffs have suffered pecuniary injury, and not only does Merrill's conduct with respect to the LAAD plans implicate the same set of concerns as the conduct alleged to have caused injury to other members of the putative class, it is the *very same* conduct in each instance.  Stated differently, Merrill breached the very same fiduciary duty in the very same way for every single putative class member, regardless of which mutual fund family was involved.  Thus, Plaintiffs' interest in securing remuneration of the damages arising from Merrill's breaches of its fiduciary duty aligns exactly with the interests of the absent class members.

Merrill itself has acknowledged the collective impact of its conduct and the collective injury to Plaintiffs and the Class:

> From at least January 2006 through December 2011, Merrill Lynch
> disadvantaged tens of thousands of small business retirement plan customers
> that were eligible to purchase Class A shares in certain mutual funds without
> a sales charge but were instead sold mutual funds with a front-end sales
> charge or Class B or C shares with back-end sales charges and higher ongoing
> fees and expenses.

---

[5]   *See also Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 332 (S.D.N.Y. 2012) (holding that to have standing, a class representative need not "literally suffer the same actual injury that each class member suffered.  That would, of course, be impossible.  Rather, the named plaintiff must 'show that he is within the class of persons who [were] concretely affected' by 'injurious conduct' by the defendant such that that plaintiff has the 'necessary stake in litigating' the case");  *In re Dynex Capital, Inc. Sec. Litig.*, 2006 WL 314524, at *12 (S.D.N.Y. Feb. 10, 2006) (plaintiff had standing to represent all classes of bonds where plaintiff alleged that "defendants made the exact same misrepresentations with respect to both series of bonds and that the bond collateral suffered from the same defects").

\*\*\*\*

[The accounts at issue] were brokerage accounts maintained on the Firm's retail brokerage platform. **The Firm therefore treated these accounts in the same manner** as other retail customer accounts for the purposes of determining share class eligibility for mutual fund purchases, rather than applying retirement plan-specified sales charge waivers.

\*\*\*\*

The Firm failed to identify that most of the mutual funds available to RCMA 05 accounts offered sales charge waivers to Retirement plans and, as a result, disadvantaged Retirement Plan account participants.

*See* AWC at 3, 5 (emphasis added).[6] Merrill made no effort then to differentiate between retirement plans based on which mutual fund families were purchased, as those distinctions were irrelevant to the pattern of misconduct. Merrill's decision to make restitution on an omnibus basis underscores the fact that Plaintiffs and the Class have the "same set of concerns" regarding Merrill's breach of its fiduciary duty in failing to obtain the waivers.

Merrill's principal authority, *IBEW-NECA v. BNY Mellon*, 287 F.R.D. 216 (S.D.N.Y. 2012), is distinguishable and predates the Second Circuit's holding in *IBEW-NECA v. Goldman Sachs.* In *IBEW-NECA v. BNY Mellon*, the trustees of an ERISA plan filed a class action alleging, in part, that several affiliated banks imprudently maintained the plan's assets in one of 10 Lehman notes at issue. The class plaintiffs argued that there was a common question as to whether any plan participating in the banks' "Securities Lending Program" should have invested in any of the 10 Lehman notes. *See id.* at 219. But whereas the plaintiffs alleged they were harmed by the banks' *holding* the Lehman notes, they sought to represent class members with claims based on the banks' imprudent *purchases* of the notes for class members. Since the plaintiffs, however, did not claim it was imprudent to purchase their particular note, the court correctly found that they could not represent a class unified by that theory of liability.[7] *See id.* at 224. In stark contrast to the *different* gravamens in that

---

[6]     *See also* the Remediation Plan at ML008776, which was Ex. 2 to the Deposition Transcript of Melissa DeWolf, and will be filed separately under seal as **Exhibit 1**: "[Merrill] determined that this pricing discount was generally not applied."

[7]     The *BNY Mellon* court recognized that its case was distinguishable from the *In re Dynex* and *Bombardier* cases cited by Plaintiffs in footnote 5 above, where the alleged

case — holding the note for too long versus purchasing the note in the first place — there is a single gravamen that infected the investments of the Plaintiffs and the Class members in this case — Merrill's failure to obtain the sales charge waivers to which they were entitled.

**B.    Plaintiffs' Claims Are Typical of the Class**

"The test for typicality is not demanding. . . . [It] centers on 'whether other members have the same or *similar injury*, whether the action is based on *conduct which is not unique to the named class plaintiffs*, and whether other class members have been *injured by the same course of conduct*.'" *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 653 (S.D. Fla. 2012) (emphasis added) (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice." *Id.* (quoting *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994)).

**1.    Plaintiffs and the Class Were Similarly Situated and Aggrieved by the Same Conduct; Merrill Itself Recognized This in the AWC**

Typicality is satisfied here because the class that Plaintiffs seek to certify is comprised of similarly situated retirement plans that were aggrieved by the same wrongful conduct by Merrill. *See Piazza*, 273 F.3d at 1351 (affirming typicality where "[t]he class members' claims [arose] from precisely the same practice and the legal issues [were] identical"). The essential facts are the same for all class members. As a result of Merrill's wrongdoing, every class member purchased mutual funds with unwarranted sales charges. Each purchase created the same result: affected plans, including the LAAD Plans, were deprived of the opportunity to purchase a Class A mutual fund without the up-front sales fee. Therefore, Plaintiffs' claims are factually typical of those of all proposed class members.

Likewise, the legal basis for Merrill's liability is identical for each class member, including Plaintiffs. If Plaintiffs prove at trial that Merrill had a fiduciary duty to secure the

---

misconduct was identical for everyone, and suggested that if the wrongs alleged by the *BNY Mellon* plaintiffs against the banks had been the same, perhaps those cases would have been relevant. *See id.* at 224.

sales charge waivers, Merrill's liability for failing to do so will be established for each class member — a hallmark of Rule 23's typicality requirement. *See Colomar v. Mercy Hosp., Inc.*, 242 F.R.D. 671, 677 (S.D. Fla. 2007).

Moreover, the import and evidentiary impact of Merrill's admissions in the 2014 FINRA AWC Letter cannot be overstated. Standing alone, the AWC Letter is "significant proof" that Merrill engaged in a pattern or practice of failing to provide sales charge waivers to its retirement plan customers. Six years after discovering the problem, Merrill essentially created its own partial remediation class (as discussed below, Merrill did not disgorge profits) comprised of the LAAD Plans and the 28,802 other plans that Plaintiffs seek to represent in this case. Thus, Merrill has already deemed LAAD's claims to be typical of the common harm suffered by its uniform practices with respect to its other customers.

### 2.  Merrill's Remediation Shortfalls Are the Result of Miscalculations Independent of the "Cascading Errors" Described by Merrill

Ignoring its admissions in the AWC Letter, Merrill argues that Plaintiffs' claims are atypical because the insufficient remediation to Plaintiffs purportedly stems from a unique "cascade" of human errors that caused one of the LAAD Plans' accounts to be marked "out of scope" in April 2010. (Resp. at 18-20). Merrill essentially argues that while a "one-off" mistake affected Plaintiffs' refund, most (if not all) of the other class members received the correct remediation amounts.[8]

Merrill's cascading errors excuse ignores the fact that Plaintiffs' claims are not only for remediation of the fees — they are also based on Merrill's failure to disgorge profits. ERISA Section 1109(a) requires Merrill to "restore to such plan *any* profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." *Id.* (emphasis added). Merrill has never disputed the fact that its $89.2 million in payments were for refund of the fees, and contained no disgorgement of profits; the 2014 FINRA AWC Letter

---

[8]    Plaintiffs' counsel sent a letter to Merrill on June 5, 2015, seeking an explanation for the remediation miscalculation. Yet the first time Merrill revealed its cascading errors theory was in early November 2016, nearly a year and a half later.

clearly describes a "remediation" or "restitution," and not disgorgement.[9]  And Merrill admits that upon proof of liability, it would be liable for profits "earned through the use of plan assets." (*See* Resp. at 2).  Its failure to disgorge profits along with remediation extends to all retirement plans in the Class, including LAAD, which makes Plaintiffs' claims typical of the rest of the Class.

Addressing the issue of cascading errors directly, an analysis of the LAAD Plans' account statements and remediation letters shows that Merrill shorted Plaintiffs independently of the supposed cascade of individualized human errors described in DeWolf's declaration.[10]   In 2012, Merrill created a written remediation plan (the "Remediation Plan"), which set forth formulas for calculating Class A front load sales charges and Class C on-going charge differentials and rear load (CDSC) charges to determine the amounts improperly paid by each retirement plan.[11]  Those formulas use analysis of various points of data kept by Merrill to determine the necessary amount of remediation.  *When the appropriate data from Plaintiffs' account statements are plugged into those formulas, however, the resulting refund amounts due on some accounts are much higher than the refunds actually paid to Plaintiffs.*[12]

When Plaintiffs' counsel questioned DeWolf about these calculations at her deposition on December 15, she agreed with the method of calculation, and acknowledged the shortfalls between what the formulas required and what Merrill actually paid to Plaintiffs.[13]  She acknowledged that, based on the new information presented to her, Merrill Lynch did not "make full compensation to plaintiffs . . . through voluntary remediation payments . . . ."[14]  DeWolf could not explain why Merrill paid the LAAD Plans less than

---

[9]      *See* 2014 FINRA AWC Letter at 6.

[10]     *See* Expert Report of Alan Spies ¶ 12, attached as **Exhibit 2.**

[11]     *See* Remediation Plan at 18-20.

[12]     *See* Spies Report ¶ 12.

[13]     DeWolf Depo. Tr. at 123-41, filed under seal as **Exhibit 3**.

[14]     *See id.* at 121.

the amounts required by the formula.[15]  Most tellingly, she acknowledged that the issue appeared to exist independently of the supposed human error raised in Merrill's Response, affecting transactions that were "in scope."[16]  Although DeWolf said she would try to find an explanation for the discrepancies,[17] none has been forthcoming.

Instead, on December 20 — five days after the deposition and six days before the Reply was due — Merrill acknowledged for the first time that the original remediation for all affected plans may have had "scoping errors" whereby Merrill did not input portions of pertinent account data into the remediation calculations.[18]  Merrill asked for additional weeks to identify missing data and rerun the remediation calculation.[19]  Plaintiffs responded that they would consider the request in return for the immediate production of other basic data and documents, and the completion of corporate representative depositions on the issues of profits and information technology.[20]  At that point, Merrill essentially stopped communicating.[21]

### 3.   Merrill Has Not Provided Documents Showing That the Refund Calculation Errors Extend to the Class

Simply put, remediation shortfalls for the LAAD Plans exist independently of the human error described in the DeWolf affidavit.  The question becomes, do these remediation discrepancies also occur in the accounts of other class members?  The analysis should be fairly straightforward, requiring only that data from other plans' account statements, trade confirmations and remediation letters be run through the Remediation Plan formulas.  Toward this end, Plaintiffs have asked for a preliminary sampling of these

---

[15]   *See id*. at 138.

[16]   *See id*. at 128, 132, 137.

[17]   *See id*. at 106, 138.

[18]   *See* Email String at 3, attached as **Exhibit 4**.

[19]   *See id*.

[20]   *See id*.

[21]   *See id*. at 1-2.

documents from 50 random accounts on a rolling basis.[22]  Merrill has declined to provide them, on a rolling basis or otherwise.  Merrill's failure to provide this basic information strongly suggests that the remediation issue extends beyond Plaintiffs' accounts.

Despite Merrill's failure to produce witnesses and fundamental documents on the incomplete remediation issue, one thing is clear: Merrill has acknowledged a remediation error independent of any cascading errors.  This evidence all supports a finding of typicality.

## C.   The Class Is Ascertainable, and Individualized Issues Do Not Predominate

Merrill also attacks certification by describing what it calls the "Sisyphean task" of ascertaining class members and calculating the remediation.   But that argument is both overblown and made opaque by Merrill's failure to provide information in discovery.

Merrill's argument downplays (again) the contents of the 2014 FINRA AWC Letter, in which Merrill itself already ascertained the class:

> Merrill Lynch has identified approximately *28,803 small business retirement plan accounts*, including 401(k) plans, *whose participants qualified for, but did not receive the benefit of, the available sales charge waiver*, after Merrill Lynch became aware of the problem.[23]

Moreover, Merrill contends that it already made the refund (but not profits) calculation, and allegedly paid a total of $89.2 million to the plans it identified.[24]  (AWC Letter at 6).  In this context, Merrill's assertion that "Plaintiffs do not offer any method for either establishing class membership or calculating damages" is puzzling, to put it charitably.  (Resp. at 2).  To the contrary, Plaintiffs have offered the method used by Merrill as described in its own AWC Letter to show that the class is ascertainable and the damages calculable.

---

[22]    Like Plaintiffs, Merrill can make the calculations that would confirm or refute this within minutes.

[23]    AWC at 3 (emphasis added).

[24]    Plaintiffs have requested from Merrill the proof of payment that it was required by the AWC to provide to FINRA.  *See* AWC at 12 (Merrill "shall submit satisfactory proof of payment of restitution or of reasonable and documented efforts undertaken to effect restitution.").

Yet Merrill now argues that the class and any further payment to the class cannot be precisely measured without individualized inquiry, thus defeating class treatment. Essentially, Merrill is saying is that its failure to set up a supervisory system for tracking waiver eligibility requirements now prevents Plaintiffs and the other plans from determining eligibility on a collective basis. Merrill's argument is perverse, not only because Merrill itself has employed collective treatment of the plans, but because prior to the conduct at issue here, Merrill was disciplined by FINRA/NASD *at least three other times* since 2002 for failing to establish supervisory systems to aid and protect its customers in connection with sales charge waivers.[25]   In other words, Merrill seeks to benefit from its own repeated wrongful conduct.

### 1.   A Core Class Is Easily and Immediately Ascertainable

Regardless, Merrill's conduct does not prevent class treatment.  Again, Merrill admitted in the AWC that the 28,803 plans it identified "*qualified for . . . the available sales charge waiver.*"[26]  Moreover, even if Merrill truly was over-inclusive, the waiver eligibility criteria of each of the 106 funds can be determined simply and quickly by reviewing the relevant section of each fund's prospectus.   Plaintiffs have reviewed the 14 fund prospectuses produced by Merrill thus far.[27]  A majority of those funds have no waiver eligibility requirements other than being an employee benefits retirement plan.  These "No Requirements Funds" pose no individualized issues whatsoever.  Thus, *at the very least*, an easily ascertainable class of retirement plans exists comprised of plans that invested in funds that have no additional waiver eligibility requirements.  Such a class would comport with

---

[25]     *See* AWC at 2.

[26]     AWC at 3 (emphasis added).  Tellingly, the DeWolf Declaration does not refute this admission.  It merely states that, in "calculating customer remediation amounts," Merrill did not apply certain eligibility criteria set out in some mutual fund prospectus.  *See* DeWolf Decl. ¶ 11.  The Declaration does not even allude to the effect, if any, that this had on the 28,803 plans that "qualified for" waivers, and specifically does not state any such plan would not have qualified.

[27]     Merrill has yet to produce the other 92 ("non-LAAD") prospectuses.

the existing class definition, which includes "employee pension benefit plans *[that] were eligible for waivers . . . ."* (Compl. ¶ 30 (emphasis added)).

This "Core Class" of retirement plans can be identified and certified now.  And it likely includes most of the 28,803 plans included in the remediation.  This is because most if not all plans, like the LAAD Plans, invested in multiple funds.  To qualify for the Core Class, only one of those funds need be a No Requirements Fund.  If a plan invested in a No Requirements Fund, then it is part of the Core Class.

Practically speaking, to determine the Core Class Merrill must produce the remaining 92 fund prospectuses so that Plaintiffs can determine which funds are No Requirements Funds.  Each of the plans that invested in those No Requirements Funds would join Plaintiffs as "eligible" under the current class definition, and thus be a part of the Core Class.  Damages calculations relating to the No Requirements Funds would feature no individualized issues.  They would require only the application of the formulas set forth in Merrill's own Remediation Plan.

### 2. Any Remaining Individualized Issues May Be Determined During the Damages Analysis or by Creating Subclasses

Because some of the Core Class plans that invested in No Requirements Funds likely also invested in funds with additional eligibility requirements relating to employee count or total plan asset amount (the "Eligibility Funds"),[28] some individualized inquiries may be required to complete a damages analysis.  But such inquiries would relate *only to damages, and not to ascertainability.*  By that time, the plan would already be identified as a class member by virtue of its investment in a No Requirements Fund.  The relevant question would be whether, in addition to the profits disgorgement and additional remediation payments a plan would receive from its investment in No Requirements Funds, a plan would also be eligible to receive profits and remediation relating to its investment in one or more Eligibility Funds.

---

[28]     For example, $1 million in plan assets or 100 employees.

Case No. 15-22782-cv-MGC

Such a damages analysis would not be so complex or burdensome as to predominate over the towering common issues relating to liability: whether Merrill breached its fiduciary duty by failing to secure sales charge waivers and disgorge its profits. All that is necessary is a computer and data relating to the plans' asset size and employee count. In its Response, Merrill does not deny that it has that data. (Resp. at 13). In fact, Merrill's remediation witness, DeWolf, testified that Merrill knows the asset sizes of its retirement plan customers.[29] Plaintiffs have requested this data.[30] And since November 2, Plaintiffs have unsuccessfully sought to examine a Merrill representative on the topic of eligibility criteria.[31]

With asset and plan-size data, Plaintiffs' consultant believes a computer program can be created to segregate any plans that do not meet size criteria.[32] Thus, for example, a plan with $500,000 in assets during the relevant period could be identified and categorized as ineligible for a recovery relating to its investment in an Eligibility Fund that required $1 million in assets. But until Merrill actually provides a witness on the subject and/or the plan size data, Plaintiffs cannot conduct the analysis.

Again, such an inquiry would impact *damages* and not *liability*. Merrill would already be liable to the plan arising out of the plan's investment in one or more No Requirements Funds. "District courts have many tools to decide individual damages." *Brown v. Electrolux Home Prods. Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016). For example, although unnecessary in this case to the extent Merrill possesses the relevant data, damages may be determined through a post-trial claims administration process with records submitted by the plans in the claims process. *See Allapattah Servs., Inc. v. Exxon Corp.,* 333 F.3d 1248, 1261 (11th Cir.2003), *aff'd* 545 U.S. 546 (2005). Such a process is not a burden that this Court needs to undertake. It is a process that can be delegated to a claims administrator or special master, to the extent that is even necessary.

---

[29]    DeWolf Depo. Tr. at 99-100

[30]    *See* Plaintiffs' Third Request for Production Nos. 6-7.

[31]    *See* Notice of Depo Topic 8. To date, Merrill has provided a witness for only 6 of the 26 topics listed on Plaintiffs' 30(b)(6) notice.

[32]    Spies Report ¶ 8.

Moreover, "[t]he fact that some review of files and submissions will be required does not defeat certification; otherwise, Defendants . . . could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, -- F.R.D. –, 2016 WL 3770957, at *16 (N.D. Ga. July 12, 2016) (citations omitted). "There will always be some level of inquiry required to verify that a person is a member of a class." *Id.* (quoting *Byrd v. Aaron's, Inc.*, 784 F.3d 154, 170 (3d Cir. 2105).

Finally, one point bears repeating. As the Eleventh Circuit emphasized in *Allapattah Services*, although individualized damages issues do sometimes arise, "[t]his fact alone, however, does not preclude class action treatment." *Id.* at 1261 (citation omitted); *see also Brown*, 817 F.3d at 1239 ("The 'black letter rule' recognized in every circuit is that 'individual damage calculations generally do not defeat a finding that common issues predominate.'"). This is particularly so where the issue of *liability* can be made with generalized proof and does not turn on individualized facts. *See Allapattah Services, Inc.* at 1260-61. Here, *it is undisputed* that Merrill failed to secure sales charge waivers for its retirement plan customers, hid that fact for six years and then reported its liability to FINRA in 2012. *It is undisputed* that when Merrill remediated, its payments did not include a disgorgement of profits as required by ERISA. And Merrill *has yet to dispute* what Plaintiffs' counsel showed its corporate representative at deposition — that using Merrill's own remediation formula, Merrill failed to pay back all of the excess continuing fees charged to the LAAD Plans on Class C shares. The only missing piece of information relating to liability involves the question of whether similar miscalculations (or worse) were made for the other 28,802 accounts. And the only reason that piece is missing is because Merrill has not produced it after repeated demands and motion to compel.

To the extent that any plans purchased only Eligibility Funds, they could be ascertained and dealt with in appropriate subclasses.

**D.**    **Profits Are Measurable and Have Not Been Disgorged as ERISA Requires**

Regardless of whether Merrill can show that it fully remediated, there is no question that Merrill did not disgorge its profits as required by ERISA § 1109.[33]  To avoid the statutorily required disgorgement, Merrill argues essentially that a determination of its "profits" is too complicated to be made on a classwide basis.[34]  (Resp. at 15).  Putting aside the fact that, as discussed above, damage calculations will not prevent certification where common issues predominate, determination of profits is readily computable on a classwide basis.  A review of the fund prospectuses (or N-1A forms) and dealer agreements produced thus far[35] shows that the calculation can indeed be made on a classwide basis.

Significantly, well before Merrill commenced the AWC misconduct in 2006, it was aware that it was prohibited from depriving clients of mutual fund sales charge waivers that they were entitled to receive.[36]  Indeed, Merrill was sanctioned by NASD/FINRA multiple times before the 2014 FINRA AWC Letter for misconduct relating to sales charge waivers.[37]  Thus, Merrill's RCMA business model could not have been designed to profit only from sales charges; any sale — even with sales charge waivers — would provide a profit to

---

[33]    *See Leigh v. Engle*, 727 F.2d 113, 139 (7th Cir.1984) ("The primary purpose of ERISA is to protect the interests of the plan beneficiaries, and the disgorgement requirements of § 1109(a) are intended to promote their interests by removing the fiduciary's incentives to misuse trust assets."); *see Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140-43, n.8 (1985).

[34]    That assertion is wrong as a matter of law, as upon proof of breach of duty "and a prima facie case of . . . ill-gotten profit to the fiduciary, the burden of persuasion" will fall on Merrill "to prove that . . . [its] profit was not attributable to the breach of duty." *See Felber v. Estate of Regan*, 117 F.3d 1084, 1087-88 (8th Cir. 1997).

[35]    Merrill has produced only 20 of the dealer agreements.

[36]    *See* NASD December 2002 "Special Notice to Members" 02-85, at 4 (pg. 930), attached as **Exhibit 5** (broker-dealers must "*ensure that customers receive the full benefit of available price discounts to which they are entitled*") (emphasis added).  The "breakpoints" referred to in this Notice refer to sales charge discounts or waivers available to certain mutual fund investors.  *See* BlackRock Form N-1A at 16–17 ("'[*B*]*reakpoints' cause a reduction in the front-end sales charge* . . . . *Additionally,* the *front-end sales charge can be reduced or eliminated through . . . a waiver* . . .") (emphasis added).

[37]    *See* AWC Letter at 2, citing Merrill's "Relevant Disciplinary History."

Merrill.[38]  Sales charges would provide enhanced profits, but were not the only source of profit to Merrill.

The only difference between the mutual funds that Merrill sold and the reduced-sales charge mutual funds that it was obligated to sell is the additional fees included in the inflated price charged by Merrill.  The upfront Class sales charges and the 75 basis-point expense differential on "C" shares (collectively the "Non-CDSC Overcharges") that Merrill improperly imposed upon the Class were virtually pure profit.[39]  As a result, expert witness Jack Duval opines that a "profit determination could be made through computerized calculations based upon the non-CDSC overcharges already calculated in Merrill Lynch's data, as adjusted if necessary based upon issues raised in this lawsuit."[40]

To the extent this profits analysis is preliminary or incomplete, that is because Merrill has failed to provide *any* of the profits- or expense-related discovery requested by Plaintiffs.  Despite the fact that Plaintiffs' November 2 deposition notice of Merrill's corporate representative included a list of profits-related topics, as of the filing of this Reply, and after repeated phone conferences and written communications between the parties, Merrill has still failed to even identify a witness to discuss this issue.[41]  Merrill also has objected to producing any profits-related documentation for members of the Class, and will not even commit produce profits-related documentation for Plaintiffs until January 13, 2017 — after the class hearing is held.[42]

## III.   CONCLUSION

For the reasons set forth above and in their Motion for Class Certification, Plaintiffs respectfully request that the Court enter an Order certifying the Class as defined in the Complaint, and entering such other relief as this Court deems just and proper.

---

[38]     *See* Report of Jack Duval ¶ 25, attached as **Exhibit 6**.

[39]     *See* Duval Report ¶¶ 25-28.

[40]     *Id.* ¶ 29.

[41]     *See* Email String attached as **Exh 3**.

[42]     Merrill's Objections to Plaintiffs Second Revised RFPs 3-8, attached as **Exhibit 7**.

Case No. 15-22782-cv-MGC

December 28, 2016

Respectfully submitted,

By: /s/Jason Kellogg
Lawrence A. Kellogg, P.A.
Florida Bar No. 328601
Primary email: lak@lklsg.com
Jason Kellogg, Esq.
Florida Bar No. 0578401
Primary email: jk@lklsg.com
Levine Kellogg Lehman
Schneider + Grossman LLP
201 South Biscayne Boulevard, 22nd Floor
Miami, FL 33131
Telephone:  (305) 403-8788
Facsimile:  (305) 403-8789

Frank R. Rodriguez
Florida Bar No. 348988
Primary email: frr@rtgn-law.com
Paulino A. Núñez Jr.
Florida Bar No. 814806
Primary email: pan@rtgn-law.com
RODRIGUEZ TRAMONT & NUÑEZ P.A.
255 Alhambra Circle, Suite 1150
Coral Gables, FL 33134
Telephone: (305) 350-2300
Facsimile: (305) 350-2525

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 28th day of December, 2016, I served the

foregoing to all counsel of record.

/s/Jason Kellogg
Jason Kellogg

Case No. 15-22782-cv-MGC

## SERVICE LIST

Carol A. Field
E-mail: cfield@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
200 S. Biscayne Boulevard, Suite 5300
Miami, FL 33131
Telephone: 305.415.3409
Facsimile: 305.415.3001

Brian T. Ortelere (admitted *pro hac vice*)
E-mail: bortelere@morganlewis.com
1701 Market Street |
Philadelphia, PA 19103-2921
Telephone: (215) 963-5150

Donald L. Havermann (admitted *pro hac vice*)
E-mail: dhavermann@morganlewis.com
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 739-5072

David I. Monteiro (admitted *pro hac vice*)
E-mail: dmonteiro@morganlewis.com
1717 Main Street, Suite 3200
Dallas, TX 75201-7347
Tel: (214) 466-4133

*Counsel for Defendant*