## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 15-22782-cv-MGC

BENJAMIN FERNANDEZ, GUSTAVO
MARTINEZ, OSCAR LUZURIAGA, and
DANIEL ARAUJO as trustees of and on
behalf of the LAAD RETIREMENT PLAN,
and as trustees of and on behalf of the
LAAD CORPORATION S.A. MONEY
PURCHASE RETIREMENT PLAN, and on
behalf of all others similarly situated,

     Plaintiffs,

v.

MERRILL LYNCH, PIERCE,
FENNER & SMITH INCORPORATED,

     Defendant.

_____/

### PLAINTIFFS' MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES AND CASE CONTRIBUTION FEE, AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs Benjamin Fernandez, Gustavo Martinez and Oscar Luzuriaga, as trustees of and on behalf of the LAAD Retirement Plan and as trustees of and on behalf of the LAAD Corporation S.A. Money Purchase Retirement Plan ("Plaintiffs"), and on behalf of all others similarly situated ("Settlement Class"), move pursuant to Fed. R. Civ. P. 23 for: (i) Final Approval of the Settlement described in the Settlement Agreement and Release attached as **Exhibit 1**; (ii) an award of Attorney's Fees to Class Counsel and reimbursement of expenses advanced by Class Counsel to prosecute the Action; and (iii) a Case Contribution Fee to Plaintiffs, and state:

## I.   __INTRODUCTION__

In June 2014, about a year before Plaintiffs filed this Action, Merrill entered into a Letter of Acceptance, Waiver and Consent (the "2014 AWC") with its regulator, FINRA, in which Merrill acknowledged its failure to provide appropriate sales charge waivers for mutual fund purchases by certain of its small business retirement customers' holding accounts ("RCMA 05 Accounts"), such as the ones held by the LAAD Plans and the Settlement Class Members.[1]   Merrill made two sets of remediation payments — one voluntary and a second pursuant to the 2014 AWC — to most of the accounts of present and former customers comprising the Settlement Class (collectively, the "Remediation").[2] The Remediation payments totaled about $79 million.

Plaintiffs, suspecting their Remediation payments were insufficient, asked Merrill to explain the methodology by which their remediation was calculated.  When Plaintiffs did not receive a satisfactory response, they filed this Action alleging breaches of fiduciary duty under Section 404(a) of ERISA.  In addition to a complete remediation, Plaintiffs sought under ERISA Section 409(a) the disgorgement of profits derived by Merrill as a result of the sales.

After nearly two years of hard-fought litigation, Plaintiffs and Class Counsel achieved an extraordinary Settlement that makes the Settlement Class Members entirely whole, and also pays the Settlement Class Members additional millions in profits that Merrill earned through its conduct.  The $25 million Settlement Amount of provides:

---

[1]    All capitalized terms not otherwise defined herein have the same meaning as set forth in the Settlement Agreement [D.E. 169-1].

[2]    Some customer accounts entitled to remediation did not receive payments, at least for a certain type of sales charge known as a contingent deferred sales charge (CDSC").  Those accounts are now included in the Settlement Class pursuant to the Settlement.

Case No. 15-22782-cv-MGC

- a *complete* recovery for Settlement Class Members, paying them *100%* of their roughly $9 million in out-of-pocket losses, which include the deficient remediation payments and interest (the "Corrective Remediation Payment");[3]

- an *additional* recovery of about $16 million in disgorged profits, which will result in the Settlement Class Members receiving a significant, additional, multimillion-dollar recovery (*even after* Class Counsel's Attorney's Fees and expenses and Plaintiffs' Case Contribution Fee are deducted).

Professor Brian Fitzpatrick, who has conducted a comprehensive empirical study of federal class settlements and maintains a large database of class settlement data, states in his opinion that he is "***not aware of any class action settlement that has recovered so much more than the class's damages***." (Declaration of Prof. Brian Fitzpatrick ¶ 17, attached as **Exhibit 2**) (emphasis added).

Other remarkable features of the Settlement include:

- The Settlement Class includes *all* of the relevant RCMA 05 Accounts and *all* of the relevant purchases of *all* 106 mutual fund families that offered sales charge waivers, avoiding an analysis of each account's eligibility for those waivers;

- It includes Contingent Deferred Sales Charge ("CDSC") refunds to additional accounts uncovered in discovery that had been incorrectly excluded from Merrill's original Remediation;

- It releases Merrill only to the extent of the RCMA 05 account claims included in this Settlement;

- It provides that Settlement Class Members will automatically receive their Settlement Payments, without having to fill out any claim forms. Settlement Payments to

---

[3] The amount of corrective remediation before including additional unpaid interest at the IRS rate through the actual payment date is $7,786,936. Preliminary estimates suggest that the additional interest will be about $1.2 million once calculated at the time of payment.

Merrill's current account holders will come in the form of an account credit, while former accountholders will receive checks using contact information recently gathered by Merrill as part of the original Remediation. Any unclaimed funds will escheat to the account holders' respective states, not to Merrill; and

- In addition to the $25 million paid to the Settlement Class, Merrill will separately pay the costs of Settlement Notice and distributions to Settlement Class Members.

In light of the benefits provided to Settlement Class Members, there is no doubt that the Settlement is fair, adequate and reasonable and deserving of Final Approval. The Settlement is not the product of collusion. It was negotiated at arms-length, through the course of two mediation sessions and subsequent communications, with the assistance of an experienced, nationally recognized mediator.

The Action was complex, given the array of substantial legal, factual and procedural defenses raised by Merrill attacking Plaintiffs' standing, the scope of Plaintiffs' claims, statute of limitations and the viability of class action status. By the time the Settlement was negotiated, discovery was closed and both sides were fully capable of making an informed evaluation of the respective strengths and weaknesses of their positions. The Settlement Amount is on the high end of the possible range of recovery, and it is far from certain that Plaintiffs and the Settlement Class would have achieved a similar outcome had the Action continued through trial and post-judgment appeal.

Having achieved a significant and, as compared to most class actions, remarkable cash benefit for the Settlement Class, Class Counsel, Levine, Kellogg, Lehman Schneider + Grossman, LLP ("LKLSG") and Rodriguez Tramont & Nuñez P.A. ("RTN"), request an award of Attorneys' Fees of $8,750,000, an amount equal to thirty-five percent (35%) of the Settlement Amount. In light of the significant risks faced, the complexity of the Action, the quality of legal work performed, the amount of labor expended and the extraordinary results

achieved, Class Counsel respectfully submit that the fee request is fair, reasonable and warranted in this case.

Class Counsel also seek reimbursement for out-of-pocket litigation expenses it has paid or agreed to pay in prosecuting the Action, totaling $222,976.11 as of the date of the filing of this Motion. There may be additional expenses through the date of the Fairness Hearing, and the final amount of unreimbursed expenses sought will be disclosed prior to the hearing. These expenses were necessary for the successful prosecution and resolution of claims against Merrill.

Finally, Class Counsel request an aggregated Case Contribution Fee to the three Plaintiffs (as trustees of the LAAD Plans) in the amount of $150,000 for their exceptional service and representation of the Settlement Class. The Case Contribution Fee is well justified. Plaintiffs themselves perceived a possible shortfall in the Remediation Payment and brought the issue to Class Counsel. Further, Plaintiffs' complaint as to the calculation of the original remediation refunds was the only one received by Merrill, and this Action was the only one filed nationwide. Plaintiffs actively engaged in the analysis of the claims, in the prosecution of the Action and in negotiating the Settlement.

## II.   BACKGROUND

During the class period, Merrill marketed and sold its services to small business employers that sought to establish 401(k) retirement accounts for their employees. Merrill referred to the accounts held by certain of its small business customers' retirement plans as Retirement Cash Management Accounts, or RCMA 05 Accounts.[4]   Merrill's services

---

[4]   The RCMA 05 accounts were distinguished from other small business retirement accounts at Merrill in that the RCMA 05 accounts allowed holders to invest in a broad array of mutual funds and individual securities, as opposed to other accounts that could purchase

included the purchase of mutual fund shares for the Plans.  More than 100 of those mutual funds offered "front load" sales charge waivers for Class A shares to retirement plans like those of the Settlement Class Members.  If an investor qualified for a Class A sales charge waiver, there was no reason for that investor to purchase Class B or C shares or any other class of shares having a sales load or higher annual expenses.

Between at least January 2006 and July 2012, Merrill did not take steps to ensure that the mutual fund companies were aware that the omnibus payments they were receiving from Merrill for purchases of mutual funds included payments for share purchases by 401(k) retirement plans.[5]  Consequently, the mutual funds did not provide sales charge waivers to these plans.  During this period, Merrill routinely sold Class A shares without waivers or Class B or C shares, with their correspondingly higher sales charges or annual expenses, to the Settlement Class Members.

In 2013, Merrill paid back $58 million to approximately 28,000 affected customer accounts, including those held by the LAAD Plans.  As part of a settlement with FINRA, Merrill paid another $21.2 million to a subset of those Settlement Class Members, as well as to additional accounts not included in the original group, in 2015.  However, Plaintiffs noticed that the amounts Merrill refunded to the LAAD Plans appeared to be less than the improper sales charges actually paid by them.  (Declaration of Benjamin Fernandez ¶ 3, attached as **Exhibit 3**).  So in 2015, Plaintiffs approached one of the law firms comprising Class Counsel, which had represented LAAD Corporation in previous matters, about potential issues with the Remediation paid by Merrill.  (*See id.* ¶ 4).  On June 5, 2015, Class

---

investments only from a relatively limited "menu" of mutual funds or other select investments.

[5]     Merrill's practice was to buy shares of mutual funds in an omnibus Merrill account, and thereafter distribute them to particular clients.

Case No. 15-22782-cv-MGC

Counsel sent a letter to Merrill requesting a full accounting of the mutual fund sales charges paid by the LAAD Plans and an explanation of how the remediation payments to the LAAD Plans were calculated. (Joint Declaration of Class Counsel ¶ 3, attached as **Exhibit 4**). Dissatisfied with Merrill's responses, Class Counsel filed the Complaint on behalf of Plaintiffs and a putative Class on July 27, 2015. (*See id.* ¶ 3).

Alleging that Merrill was a "fiduciary" of the LAAD Plans under ERISA Section 3(21), Plaintiffs brought two distinct claims for breach of fiduciary duty. The first alleged that Merrill violated its fiduciary duties under Section 404(a)(1)(A) and (B) by failing to discharge its duties solely in the interest of the LAAD Plans' participants and beneficiaries. The second alleged that Merrill violated Section 404(b)(1) and (3) by dealing with the LAAD Plans' assets in its own interest or for its own account. Each count sought damages and disgorgement of profits under Section 409(a), through ERISA's civil enforcement mechanism found at Section 502(a)(2).

Merrill moved to dismiss on the grounds that it was not an ERISA "fiduciary," that Plaintiffs' claims were securities rather than ERISA claims, and that the claims improperly interfered with a comprehensive federal scheme of securities regulation. The Parties fully briefed the issues. The Court held oral argument on July 27, 2016, and subsequently denied Merrill's motion.

Initially, Merrill repeatedly and steadfastly maintained that it had made all required Remediation payments due to Plaintiffs and the other affected retirement plans. (*See id.* ¶ 5). It did so before Plaintiffs commenced the Action, at a hearing before the Court and in its Answer. (*See id.*). To test Merrill's representations, Plaintiffs undertook extensive discovery efforts in an extremely compressed time frame. (*See id.* ¶ 6). Merrill repeatedly moved to extend discovery deadlines, and also moved to stay the Action. (*See id.*). Class Counsel successfully opposed those motions. (*See id.*).

Class Counsel conducted discovery in a focused and efficient manner, with the dual goals of testing Merrill's remediation and determining what profits Merrill had earned using the millions of dollars of sales charges and fees that had been incorrectly charged. (*See id.*). To this end, Plaintiffs served nine discovery requests, filed six motions to compel and as a result were able to obtain more than 125,000 pages of financial and other documents from Merrill. (*See id.* ¶ 7). Plaintiffs received thousands of additional records by subpoenaing FINRA and some of the 106 mutual funds sold by Merrill that offered sales charge waivers. (*See id.*). These voluminous documents were analyzed by Class Counsel and their experts, many of them simultaneously with their taking of depositions of Merrill's employees. (*See id.*). Plaintiffs took five depositions of Merrill's employees, prepared to take the deposition of Merrill's expert and defended six depositions of Plaintiffs and their experts. (*See id.*). Class Counsel and Plaintiffs' data science expert Alan Spies spent hundreds of hours analyzing account statements and other documents, including raw data and dozens of complex spreadsheets produced by Merrill. (*See id.*). Together, they analyzed and tested how the Remediation was designed and implemented by Merrill. (*See id.*). Through these efforts, Class Counsel determined that the Remediation was incorrect in several respects, not only in the amounts paid, but also in identifying all of the CDSC fees charged to plans that were entitled to remediation. (*See id.*). They also learned the categories and amounts of profits earned by Merrill due to the improper mutual fund sales charges to class members. (*See id.*).

During this period of intensive discovery, Merrill's position on the remediation changed. (*See id.* ¶ 8). First, it maintained that the LAAD Plans had received full remediation. (*See id.*). Then it admitted that this was not accurate; that in fact, the LAAD Plans had not received the entirety of the remediation to which they were entitled. (*See id.*). Merrill nevertheless continued to maintain that this was a problem unique to LAAD, and did not affect any other retirement plan account. (*See id.*). As Class Counsel and its experts

continued to probe, however, Merrill identified deficiencies in the remediation that were applicable to additional customers. (*See id.*). As time went on, and discovery continued, Merrill concluded and admitted that some customers eligible for remediation of certain CDSC charges had received nothing, and that the methodology used to compute interest was incorrect. (*See id.*). Merrill also acknowledged that it had made other significant errors in calculating the amounts owed that affected thousands of accounts. (*See id.*).

Despite recognizing these problems with its remediation, Merrill continued to aggressively oppose class certification, arguing that the class was not ascertainable due to individualized issues with the thousands of customers affected, as well as other issues such as statute of limitations. Merrill also insisted that the different criteria for fee waivers in many mutual fund prospectuses meant that many accounts were not even entitled to the remediation payments they had originally received, and certainly were not entitled to additional refunds. It also contended that the class action was not manageable due to the vast number of customer accounts affected by the alleged errors and the different criteria for fee waivers.

Merrill also aggressively contested disgorgement of profits. Merrill argued that profit calculations had to be made on each trade, which it contended would be next to impossible. It also contended that it either had earned only minimal profits on the excessive fees, or had paid back all profits in the remediation.

The Parties fully briefed Plaintiffs' Motion for Class Certification. (*See id.* ¶ 9). Class Counsel prepared and submitted extensive expert reports on the issues of fiduciary duty and class ascertainability and manageability. (*See id.*). Plaintiffs also successfully opposed motions by Merrill to stay the case or extend deadlines. (*See id.*). On February 6, 2017, the Parties conducted a day-long evidentiary hearing on class issues before Magistrate Judge Torres. (*See id.*). The Magistrate Judge did not conclude the hearing, but kept the parties on a strict discovery time frame to flesh out issues raised by Merrill in its opposition to

certification. (*See id.*). In accordance with the Court's deadlines, the Parties also began drafting Motions for Summary Judgment and class-related Proposed Findings of Fact and Conclusions of Law in advance of the trial set for June 6, 2017. (*See id.*).

With class certification and trial looming, the Parties conducted two, day-long mediation sessions in Atlanta. (*See id.* ¶ 10). The first, on March 3, 2017, was attended by Plaintiffs Benjamin Fernandez and Oscar Luzuriaga. (*See id.*). The second, on March 14, was attended by Plaintiff Gustavo Martinez. (*See id.*). The mediation sessions were conducted by Hunter Hughes III, who mediated the *Walmart v. Dukes* case, among many other large and complicated class actions. (*See id.*). Although those sessions did not immediately result in settlement, the Parties continued to engage in intense settlement talks through the mediator via telephone and email. (*See id.*). Those talks ultimately resulted in a settlement term sheet on May 12, 2017. (*See id.*). A formal Settlement Agreement was executed on June 8, 2017. (*See id.*).

On October 13, 2017, the Court adopted Magistrate Torres' Report and Recommendation granting Plaintiffs' Unopposed Motion for Preliminary Approval. [D.E. 176]. Pursuant to the Preliminary Approval Order, Settlement Notice was disseminated to Settlement Class Members via U.S. mail and email (where available), and was also posted on the Settlement Website. The Settlement Notice advised Settlement Class Members about the terms of the Settlement, including the $25 million Settlement Amount, Class Counsel's intention to seek Attorney's Fees equal to 35% of the Settlement Amount plus litigation expenses, and a Case Contribution Fee of $150,000 for the three Plaintiffs. The Settlement Notice also advised Settlement Class Members of their right to object to the Settlement, of the deadline and process for doing so, and of the date of the Fairness Hearing. To date, there have been no objections.[6]

---

[6]     Plaintiffs will file a declaration detailing the efforts of Garden City Group, Inc., and a report on the Settlement Notice nearer the date of the Fairness Hearing set for December

## III.   SUMMARY OF THE SETTLEMENT TERMS

The Settlement Class consists of all retirement accounts—without individual analysis of eligibility for fee waivers by any particular mutual fund — that received payment(s) in the original Remediation, and those that should have but did not.   The Settlement Class is defined as the trustees and named fiduciaries of each Plan, as that term is defined in ERISA § 3(3):

1. that, at any time between January 1, 2006 and July 13, 2012, held any interest in one or more RCMA 05 Accounts, whether
   a. in the name of the Plan, or
   b. in the name of a trustee or named fiduciary on behalf of the plan, or
   c. for the benefit of a Participant in the Plan; and
2. that either
   a. received, or was issued, whether for the benefit of the Plan or a Participant in the Plan, a Remediation Payment in any amount, or
   b. held an interest in an Omitted Remediation Account.

The Settlement Amount is $25 million.   Within 14 days of Final Approval, Merrill shall deposit the Settlement Amount in an interest-bearing Escrow Account maintained by a third-party Settlement Administrator, Garden City Group, Inc. ("Garden City").   The Settlement Amount will be used to pay the Court-approved (i) Case Contribution Fee, (ii) Attorneys' Fees and Reimbursable Expenses, and (iii) Taxes and Tax-Related Costs.   The remaining Distributable Settlement Amount shall be disbursed to the Settlement Class Members by check (for Settlement Class Members who are no longer RCMA 05-successor[7] Accountholders) or by account credit (for those who are).   A Settlement Class Member's Distributable Settlement Amount will consist of the full amount of any Corrective Remediation Payment that may be required to make them whole for the sales charges, and

---

13, 2017.

[7]    The RCMA 05 accounts were discontinued in July 2012.  Assets held in RCMA 05 accounts on that date were transferred to other Merrill retirement accounts that were not subjected to front load mutual fund fees.

unpaid interest to the date of the distribution.  In addition, each Settlement Class Member will receive a pro-rata Disgorgement Payment based on account values at various points in time.

In exchange for the Settlement Amount, Plaintiffs and the Settlement Class Members will provide Merrill and its related parties with a limited release of any Claim that was pleaded in the Complaint or that could have been pleaded based on the same factual predicate.

Merrill agrees to separately pay all costs of administration of the Settlement, including the costs of sending the Settlement Notice.  On November 2, 2017, Garden City sent the Settlement Notice to the Settlement Class Members by first-class mail or email. Garden City also established a Settlement Website containing the Settlement Notice and the Settlement Agreement, and a toll-free Settlement Information Line to which Settlement Class Members can direct questions about the Settlement.

The Settlement Agreement provides Settlement Class Members with the right to object to the Settlement Agreement.  The deadlines and requirements for filing and pursuing an objection were described in the Settlement Notice.

## IV.    THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT

Under Fed. R. Civ. P. 23(e), approval of the settlement is appropriate.  "Federal courts have long recognized a strong policy and presumption in favor of class action settlements." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1341 (S.D. Fla. 2011).  In approving a class settlement, a court must determine that it is fair, reasonable and adequate, and was not the product of collusion. *See Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1217 (11th Cir. 2012).  The Court "will not substitute its business judgment for that of the parties . . . ." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1341 (quoting *Rankin v. Rots*, 2006 WL 1876538, at *3 (E.D. Mich. June 27, 2006)).  Rather, the Court

shall consider the question of "whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval." *Id.*

Procedurally, the Court must first analyze the adequacy of the notice provided to class members.   Then it must analyze a number of factors to determine whether the settlement is "fair, adequate, reasonable, and not the product of collusion."   *Id.* (quoting *Leverso v. SouthTrust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 (11th Cir. 1994)).

### A.   The Court Has Personal Jurisdiction Over Settlement Class Members Because They Received Adequate Notice and an Opportunity to Be Heard

The Court has personal jurisdiction over Plaintiffs, who are parties to this Action. Additionally, the Court has personal jurisdiction over all Settlement Class Members because they received adequate notice.

For a court to exercise jurisdiction over the claims of absent class members, those class members must have received "'the best practicable' notice which was 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"   *Id.* (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985)).

Here, the Settlement Notice reasonably informed Settlement Class Members of the Settlement and their rights thereunder.  The Settlement Notice defined the Settlement Class; described the Settlement Amount; described the method and manner of the proposed distribution of the Settlement Amount; informed Settlement Class Members of their right to object to the Settlement and the deadline and procedures for doing so; described the release to be given to Merrill; and described the date, time and place of the Fairness Hearing.  The Settlement Notice also informed Settlement Class Members where to obtain more information and a copy of the Settlement Agreement.   It further explained that Class

13

Counsel would seek attorney's fees up to 35% of the Settlement Amount and expenses of up to $300,000, and that Plaintiffs collectively would seek a $150,000 Case Contribution Fee.

The Settlement Notice was disseminated by the Settlement Administrator on November 2, 2017, to each of the 38,909 Settlement Class Members at their last-known first-class mail address or electronic mail address. These addresses were provided to the Settlement Administrator by Merrill. A significant percentage of Settlement Class Members are still Merrill customers, increasing the likelihood of up-to-date, accurate contact information. For those Settlement Class Members who are no longer Merrill customers, Merrill gathered relatively up-to-date contact information on a material number of those former customers when it conducted the last remediation in 2015. The Settlement Administrator also updated all mailing addresses through the National Change of Address database before mailing, with all returned mail skip-traced and promptly re-mailed.

In addition, the Settlement Administrator established a Settlement Website containing the Settlement Notice and the Settlement Agreement. The Settlement Administrator also established a toll-free Settlement Information Line to which Settlement Class Members could direct questions about the Settlement. The Settlement Administrator developed a question-and-answer-type script, with input from the Parties and their counsel, for use by those answering calls to the Settlement Information Line.

As of the date of this filing, Class Counsel is not aware that any Settlement Class Members have objected to the Settlement. (Class Counsel Decl. ¶ 15). Merrill served Notice of the Settlement upon the appropriate federal and state officials as required by CAFA, 28 U.S.C § 1715. [D.E. 178]. None of those officials has objected to the Settlement.

Case No. 15-22782-cv-MGC

### B.    The Settlement is Fair, Adequate and Reasonable, and Was Not the Product of Collusion

The Eleventh Circuit has identified several factors to be considered in analyzing the fairness, reasonableness and adequacy of a class action settlement:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of the litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was reached.

*Borcea v. Carnival Corp.*, 238 F.R.D. 664, 672-73 (S.D. Fla. 2006) (Cooke, J.) (citing *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)).   In weighing these factors, courts recognize that settlements usually involve a significant amount of give-and-take between the negotiating parties; therefore, courts do not attempt to rewrite settlement agreements or resolve issues that are left undecided as a result of the parties' compromise. *See In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1341.

Courts also look to see whether the settlement is a product of collusion.  A proposed class action settlement enjoys a presumption of fairness where it was the product of arm's-length negotiations conducted by capable, experienced counsel. *See, e.g., In re United States Sugar Corp. Litig.*, No. 08-80101, 2011 WL 13173854, at *2 (S.D. Fla. Jan. 24, 2011).  As set forth below, an analysis of these factors shows the Settlement to be fair, adequate and reasonable, and not the product of collusion.

### 1.    Likelihood of success at trial

Where a substantial question exists regarding the likelihood of success at trial, this factor weighs in favor of approving a proposed class action settlement. *See In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1330-31 (S.D.Fla.2001).  In assessing the Settlement, the Court should balance the immediacy and certainty of a recovery for the Settlement Class

against the risks of continued litigation. *See Francisco v. Numismatic Guaranty Corp. of Am.*, No. 06-61677, 2008 WL 649124, at *9 (S.D. Fla. Jan. 31, 2008).

Here, a positive outcome for Plaintiffs and all Settlement Class Members was far from certain. Merrill challenged Plaintiffs' standing on the ground that the LAAD Plans did not invest in mutual funds from each of the 106 mutual fund families[8] sold by Merrill to class members that made fee waivers available. Merrill contended that Plaintiffs could represent only those plans that invested in the same 14 mutual fund families purchased by the LAAD Plans. If Merrill's standing argument had prevailed, it would have greatly curtailed the scope of this Action and limited the number of Accounts receiving relief. The Settlement resolves this issue favorably to the Settlement Class, and investors in all 106 mutual fund families sold during the class period will be eligible for recovery.

Merrill also challenged class certification on ascertainability and manageability grounds. Many of the 106 relevant mutual fund families had sales charge waiver "eligibility requirements." For instance, some required the plans to have minimum assets under management and/or a threshold number of plan participants. Merrill argued that membership in the class could only be ascertained through an individual analysis of eligibility on the date of each trade in each account (totaling many millions of trades), over the entire six-year class period. Merrill claimed that it could not conduct such an analysis because it did not possess the requisite information about each plan. Merrill argued that the information needed to determine eligibility could only come from the plans themselves, and it was unlikely, or at least uncertain, that all of the plans retained the historical records necessary to do the analysis. For these and other reasons, Merrill argued that it was nearly impossible to ascertain membership in the class, and that a class would therefore be

---

[8]    There were over 9,500 individual mutual funds available to RCMA 05 account holders, but these were generally marketed by 120 mutual fund groups or "families." Front load fee waivers were made available to retirement plan customers by 106 of the fund families.

unmanageable. While Plaintiffs and Class Counsel always believed that class certification was fully warranted, in the event the Court sided with Merrill it could have denied class treatment, or limited the class to those accounts that purchased funds having no eligibility requirements. Denial of class certification would have meant that each holder of a RCMA 05 account that wanted to challenge their Remediation payment (assuming they were even aware of the issue) would have only one available alternative — to bring an individual FINRA arbitration case.[9] Remarkably, the Settlement favorably resolves this issue by including *all* of the relevant RCMA 05 accounts and purchases of *all* 106 mutual fund families, without requiring an analysis of each account's eligibility.

Additionally, Merrill denied having a fiduciary duty to beneficiaries of the RMCA 05 accounts, under ERISA or otherwise. It also raised the ERISA statute of limitations, arguing that many of the sales took place outside the limitations period. Either defense, if successful, would have eliminated or severely limited potential recovery for the Settlement Class. Yet the Settlement Agreement covers RCMA 05 accounts all the way back to 2006.

Merrill also challenged the categorization of "profits" sought by Plaintiffs. Specifically, Merrill contended that the $19.5 million in marketing fees it collected from mutual funds sold to Settlement Class Members during the Relevant Period did not constitute revenues attributable to the breach of fiduciary duty set forth in the Complaint. Merrill also contended that $14.5 million in distribution expense fees (12b-1 fees) paid to Merrill by the mutual funds had essentially already been paid back to the clients or paid to mutual funds on behalf of clients as part of the Remediation, and therefore should not be subject to disgorgement. With respect to "sub-accounting" fees that it earned in keeping track of the sales charges for the mutual funds, it contended that after its expenses profits

---

[9]     Merrill's RCMA 05 account contract required individual claims to be arbitrated before FINRA.

were minimal.   If successful, Merrill's arguments would have significantly reduced Plaintiffs' and Settlement Class Members' profit disgorgement recovery.   The Settlement resolves these challenges, and results in disgorgement of about $16 million in Merrill profits.

In sum, the likelihood of success at the class hearing or trial was uncertain.   Given the many risks posed by Merrill's defenses, the Settlement represents a fair compromise.   *See Bennett*, 96 F.R.D. at 349-50 (holding that factual and legal problems made it "unwise to risk the substantial benefits which the settlement confers . . .to the vagaries of trial").

### 2.   Range of possible recovery

The Settlement is comprised of two recoveries: the $9 million Corrective Remediation Payment and the $16 million Disgorgement Payment.   The Corrective Remediation Payment represents Settlement Class Members' actual out-of-pocket losses.   It includes the deficiencies from the original Remediation plus interest.   The range of possible recovery is $0 to $9 million.

The Disgorgement Payment represents the profits made by Merrill on the overcharged fees.   These arguably include approximately $700,000 in sub-accounting fees, $14.5 million in 12(b)(1) fees and $19.6 million in marketing fees, for a total of $34.8 million.   The range of possible recovery under Plaintiffs' disgorgement theory is therefore $0 to $34.8 million.   Note, however, that in the course of litigation Merrill contended that the $14.5 million in 12(b)(1) fees and $19.6 million in marketing fees did not constitute "profits."   Moreover, Merrill further argued that if the 12(b)(1) fees were indeed profits, they had already been disgorged.   Thus, under Merrill's analysis, the range of possible recovery under a disgorgement theory was significantly smaller.

Case No. 15-22782-cv-MGC

3.    **The point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable**

With the Corrective Remediation Payment, the Settlement achieves a *100% recovery* of Settlement Class Members' out-of-pocket losses, making it more than fair, adequate and reasonable on that basis alone.

And with the Disgorgement Payment, the Settlement goes farther, obtaining an additional recovery under Plaintiffs' profit disgorgement theory, which is designed to punish an ERISA fiduciary who violates ERISA's standard of conduct.   *See Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 944 (8th Cir.1999).   The $16 million Disgorgement Payment represents 46% of the potentially $34.8 million in profits sought by Plaintiffs, and over 20 times, and millions of dollars, *more than* the $700,000 in profits acknowledged by Merrill.

Taken together, the Corrective Remediation Payment and Disgorgement Payment recover 57% of the total potential statutory recovery.   (Fitzgerald Decl. ¶¶ 17-18).   The Settlement therefore far exceeds the range of reasonableness, particularly when considering the possibility of delayed recovery or no recovery at all.   *See In re Checking Account Overdraft Litig.,* 830 F. Supp. 2d at 1346 (finding that a recovery of between 9% and 45% was an "exemplary result"); *see also Saccoccio v. JP Morgan Chase Bank*, N.A., 297 F.R.D. 683, 693 (S.D. Fla. 2014) ("Even assuming that the monetary figure represents only 12.5% of Plaintiff's damages, which the Court is satisfied they do not, this recovery would still be adequate."); *see also* Declaration of Robert C. Gilbert ¶¶ 64-66, attached as **Exhibit 5**.   This is especially so considering that Settlement Class Members will receive their benefits automatically, without having to fill out a claim form or take any other affirmative action. *See In re Checking Account Litig.*, 830 F. Supp. 2d at 1351.

**4.    Complexity, expense and likely duration of continued litigation**

The complexity of Plaintiffs' claims weighs in favor of the Settlement, as this Action involved multiple complex legal and factual issues and has already spanned nearly two years.  *See Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005) ("Complex litigation . . . can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive.") (citation omitted).   The Action centered on a complex statute, ERISA.   It involved the interplay between ERISA and the duties imposed on broker-dealers under SEC and FINRA regulations.  It required navigating within class action jurisprudence and the financial services world.  In addition, it required analysis of the information technology components of Merrill's remediation system.

The Action was expensive, requiring Plaintiffs and Class Counsel to commit thousands of hours toward prosecuting it.  (Class Counsel Decl. ¶ 11).   Class Counsel incurred hundreds of thousands of dollars in expenses, including significant fees for its trial experts.  (*See id.*).   Those expert fees would have increased substantially had the Action proceeded to trial.  (*See id.*).

It took nearly two years for the Action to settle at the eve of trial.   Prior to Settlement, the parties still needed to complete the class certification hearing and try the case.  Had either side lost either phase, it almost certainly would have filed an appeal, extending the Action by at least an additional year.

**5.    Substance and amount of opposition to Settlement**

The lack of objections to a settlement is a significant factor in deciding whether a proposed settlement is fair.  *See Diakos v. HSS Sys., LLC*, No. 14-61784, 2016 WL 3702698,

Case No. 15-22782-cv-MGC

at *5 (S.D. Fla. Feb. 5, 2016); *see also Assn. for Disabled Ams. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) ("[A] small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness.").

Here, as of the date of this Motion, Class Counsel is not aware of any member of the Settlement Class who has objected to the Settlement. This is not surprising given that the alternative to this recovery is an individual claim against Merrill in the industry's self-regulatory forum, FINRA arbitration. There is no realistic chance of a Settlement Class Member receiving more than 100% of its out-of-pocket losses and a significant profits disgorgement in that forum, where discovery is severely limited and depositions almost never permitted.

### 6.   Stage of proceedings

"A court evaluates the stage of the proceedings at the time of settlement to ensure that the plaintiffs have access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of the settlement against further litigation." *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1383 (S.D. Fla. 2007).

Here, the Settlement was reached nearly two years into litigation at a time when the Parties thoroughly understood the strengths and weaknesses of their respective positions. The Parties conducted extensive discovery, punctuated by Plaintiffs' six motions to compel. The Parties engaged in significant motion practice. The Parties fully briefed Plaintiffs' Motion for Class Certification and conducted a day-long evidentiary hearing on class issues before Magistrate Judge Torres. The Parties took the case to the eve of trial. Plaintiffs began drafting Motions for Summary Judgment and class-related Proposed Findings of Fact

and Conclusions of Law.  Trial was set for June 6, 2017, less than 30 days from the date the Settlement was agreed upon.

With the knowledge gained through extensive litigation, the Parties engaged in extensive arm's-length settlement negotiations, including two mediations.  (Class Counsel Decl. ¶ 10).  As a result, Class Counsel had a comprehensive understanding of the strengths and weaknesses of Plaintiffs' case.  (*See id.*).  A resolution now maximizes Settlement Class Members' recovery and minimizes the cost and risk of further litigation.

### 7.    The Settlement is not the product of collusion

The Settlement resulted from extensive arm's-length negotiations by experienced counsel on both sides after two mediation sessions and subsequent negotiations spanning several months.  The Parties litigated for nearly two years and the sharply contested nature of the proceedings readily demonstrates the lack of fraud or collusion behind the Settlement. *See, e.g., Carter v. Forjas Taurus S.A.*, No. 1:13-cv-24583, 2016 WL 3982489, at *9 (S.D. Fla. Jul. 22, 2016) (finding that it was clear the settlement was not the result of fraud or collusion where the settlement was the product of extensive arms-length negotiations in a highly adversarial case).

Moreover, Class Counsel and their fees experts believe that this Settlement is extraordinary and deserving of final approval.  (Class Counsel Decl. ¶ 14; Fitzpatrick Decl. ¶¶ 17-23; Gilbert Decl. ¶¶ 23-29).  The Court gives "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1351.

In addition, Defendants served Notice of the Settlement upon the appropriate officials as required by CAFA, 28 U.S.C § 1715.  Neither the U.S. Attorney General

through the U.S. Department of Justice, the Consumer Financial Protection Bureau, the Office of the Comptroller of the Currency, the Securities and Exchange Commission, nor any state securities regulator objected, although they were all notified of the opportunity to do so. [D.E. 178]. "These are powerful indicia that the Settlement is fair, reasonable, and adequate and deserves final approval." *Braynen v. Nationstar Mortgage, LLC*, 14-CV-20726, 2015 WL 6872519, at *6–7 (S.D. Fla. Nov. 9, 2015).

### C. The Court Should Certify the Settlement Class

On October 13, 2017, this Court entered the Preliminary Approval Order, finding the requirements of Rule 23(a) and 23(b)(1) satisfied in this action. [D.E. 176 (adopting D.E. 175)]. Nothing has occurred in the interim that impacts the Court's preliminary ruling. The Court should make the same class certification findings in granting Final Approval.

## V. CLASS COUNSEL'S REQUEST FOR ATTORNEYS' FEES IS REASONABLE AND SHOULD BE GRANTED

### A. Legal Standard for an Award of Attorneys' Fees in Common Fund Cases

The Supreme Court has long recognized that where counsel's efforts have created a "common fund" for the benefit of a class, counsel should be compensated from that fund. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). In the Eleventh Circuit specifically, "attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *See Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991); *Gevaerts v. TD Bank*, No. 11:14-cv-20744, 2015 WL 6751061, at *10 (S.D. Fla. Nov. 5, 2015) ("[C]lass counsel is awarded a percentage of the fund generated through a class action settlement.").

Courts have substantial discretion in determining the appropriate fee percentage awarded to counsel. *See, e.g., Gevaerts*, 2015 WL 6751061, at *10. "There is no hard and

fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *Camden I*, 946 F.2d at 774.

Courts routinely apply a 12-factor analysis when evaluating the reasonable percentage to award class counsel: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases. *See id.* at 772 n.3 (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

These 12 factors are nonexclusive. "Other pertinent factors are the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action." *Id.* at 775. In addition, the Eleventh Circuit has encouraged lower courts to consider any other factors unique to the particular case. *See id.* Most fundamentally, however, "monetary results achieved predominate over all other criteria." *See id.* at 774.

Finally, when analyzing the various factors, a lodestar cross-check is unnecessary, and in the view of many class action scholars, is counterproductive and therefore undesirable. (Fitzpatrick Decl. ¶¶ 8-10). In fact, "in the Eleventh Circuit, 'the lodestar

approach should not be imposed through the back door via a 'cross-check.'" *Wilson v. EverBank*, No. 14-cv-22264, 2016 WL 457011, at *13 (S.D. Fla. Feb. 3, 2016) (quoting *In re Checking Account Overdraft Litig.,* 830 F. Supp. 2d 1330, 1362 (S.D. Fla. 2011)). The Eleventh Circuit "made clear in *Camden I* that percentage of the fund is the *exclusive* method for awarding fees in common fund class actions." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1362 (emphasis added) (citing Alba Conte, ATTORNEY FEE AWARDS § 2.7, at 91 n.41 ("The Eleventh . . . Circuit[ ] repudiated the use of the lodestar method in common-fund cases.")). Lodestar "encourages inefficiency" and "creates an incentive to keep litigation going in order to maximize the number of hours included in the court's lodestar calculation." *Id.* at 1362-63. Thus, "courts in this Circuit regularly award fees based on a percentage of the recovery, without discussing lodestar at all." *Id.* at 1363; *see also Reyes v. AT&T Mobility Servs., LLC*, No. 10-20837, at *6 (S.D. Fla. Jun. 21, 2013) (Cooke, J.); *In re Takata Airbag Prods. Liability Litig.*, No. 15-02599, at *9-10 (S.D. Fla. Nov. 1, 2017).

**B.**     <u>**The Requested 35% Fee is Reasonable**</u>

In light of these factors, Class Counsel respectfully submits that a 35% fee recovery is reasonable and warranted. The reasonableness of Class Counsel's request has been examined by Robert Gilbert, a Miami-based attorney who has negotiated more than $1.2 billion in class action settlements, and Professor Brian Fitzpatrick, a leading scholar on class actions. These experts have reviewed the file in the context of the *Camden I* factors and concluded that Class Counsel's request for a fee equal to 35% of the Settlement Amount is reasonable and warranted. (*See* Fitzpatrick Decl. ¶ 23; Gilbert Decl. ¶ 70).[10]

---

[10]     In fact, when taking into account the costs to notify the class and administer the settlement — costs that are being borne by Merrill — Class Counsel's request is actually less than 35%. (Fitzpatrick Decl. ¶ 14). In many settlements, such administration costs are paid from the settlement fund as opposed to on top of the settlement fund. (*See id.*).

### 1.     The Action required a significant amount of attorney time and labor

Because prosecuting the Action required Class Counsel to expend a significant amount of time and labor, the <u>first factor</u> supports the reasonableness of Class Counsel's fee request. Indeed, the scope and complexity of this Action required Class Counsel to focus on it *exclusively* for extended periods of time.

At the outset, Class Counsel conducted a pre-suit inquiry into the possible Remediation shortfall and engaged Merrill in extensive written communications. Class Counsel painstakingly analyzed Plaintiffs' account statements and researched a cause of action under ERISA's statutory and regulatory framework. Class Counsel extensively briefed and successfully argued in opposition to Merrill's motion to dismiss. Class Counsel overcame Merrill's attempts to quash or delay merits-related discovery, which ultimately led to the production of more than 125,000 pages of documents and complex spreadsheets in native format. In the face of Merrill's repeated assertions that its Remediation had no issues, Class Counsel pored through samples of account statements and made the initial mathematical computations that confirmed that the remediation indeed had significant errors. They identified, engaged and worked closely with the quantitative analyst Alan Spies to identify the extent of the problems.

Faced with Merrill's opposition to discovery, Class Counsel filed six motions to compel and conducted five out-of-town depositions. Class Counsel fully briefed the issue of class certification — which Merrill opposed — and prepared for and attended a one-day evidentiary hearing on class certification before Magistrate Judge Torres. The extensive time and labor expended did not end when the Parties sat down to mediate. That process itself was grueling and time consuming. It took more than two months to negotiate and

execute the Settlement Agreement.  Throughout that time, Class Counsel researched and drafted a summary judgment motion and began to prepare trial briefs.

In sum, it is beyond legitimate dispute that substantial time and labor were required of Class Counsel in prosecuting this case.  (Gilbert Decl. ¶¶ 38-48).

### 2.      Class Counsel achieved an excellent result for the Settlement Class despite the complexity of the case

The <u>second factor</u> examines the novelty and difficulty of the questions involved, while the related <u>eighth factor</u> looks to the amount involved in the litigation with particular emphasis on the "monetary results achieved" in the case.  *See Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1202 (S.D. Fla. 2006).  Again, "the result achieved by counsel is a major factor to consider in making a fee award."  *Wilson*, 2016 WL 457011, at *14.

Here, the results obtained were extraordinary.  (Fitzpatrick Decl. ¶¶ 17-18; Gilbert Decl. ¶¶ 64-66).  The Settlement Class will be made whole on each Settlement Class Member's out-of-pocket losses, plus interest to the date of the distribution.  In addition to their out-of-pocket losses, Settlement Class Members will receive a *pro rata* distribution of millions of dollars of profits that Merrill earned as a result of its conduct.  Thus, after payment of all Attorneys' Fees, reimbursement of costs and the Case Contribution Fee to the Plaintiffs, Settlement Class Members will receive far more than 100% (almost 200%) of their actual losses.  Professor Fitzpatrick, who has conducted a comprehensive empirical study of federal class settlements and maintains a large database of class settlement data, expressed the view that he is "not aware of any class action settlement that has recovered so much more than the class's damages." (Fitzpatrick Decl. ¶ 17).

### 3.    The Action posed considerable risks to Class Counsel

As to the <u>sixth factor</u>, Class Counsel took on considerable financial risk to obtain the results here, prosecuting this complex action entirely on a contingency fee basis. *See, e.g.*, *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1364 ("A contingency fee arrangement often justifies an increase in the award of attorney's fees.") (quoting *In re Sunbeam Secs. Litig.*, 176 F. Supp. 2d at 1335)). The many defenses posed by Merrill, as described in Part IV.B.1 above, as well as the likelihood of an appeal, all militate in support of Class Counsel's fee request. (Fitzpatrick Decl. ¶¶ 18-19; Gilbert ¶¶ 50-51).

Class Counsel devoted thousands of hours of time and fronted hundreds of thousands of dollars in expenses, including payment to experts, with no guarantee of any recovery or reimbursement of expenses. LKLSG and RTN have only 15 and five attorneys, respectively. (*See* Class Counsel Decl. ¶ 11). The commitment of labor and up-front payment of expenses posed a considerable risk to the financial security of each firm had the lawsuit failed to achieve a recovery for the Class.

### 4.    No other lawyers pursued similar claims

As to the <u>tenth factor</u>, the absence of any other class action against Merrill seeking the same relief suggests it was an "undesirable" one for the Plaintiffs' bar. Despite the fact that the claims raised affected a nationwide group of 38,909 small business retirement accounts, Class Counsel were the only lawyers in the country to bring a lawsuit. Class Counsel uncovered the problem and pursued it diligently. No other lawyer, for any of the affected retirement plans, did the same. These facts strongly support Class Counsel's fee request. (Fitzpatrick Decl. ¶ 19; Gilbert Decl. ¶ 67).

### 5.    This case required a high level of skill

The <u>third factor</u> and the <u>ninth factor</u> — the skill required to perform the legal services properly and the experience, reputation, and ability of the attorneys — confirm the

Case No. 15-22782-cv-MGC

reasonableness of the fees sought.  As described in Part V.B.1 above, Class Counsel skillfully performed the complex legal services necessary to obtain a recovery for the Class.

The quality and vigor of opposing counsel is also important in evaluating the services rendered by class counsel.  *See In Checking Account Overdraft Litig.,* 830 F. Supp. 2d at 1363 (citing *Camden I*, 946 F.2d at 772 n.3); *Walco Invs., Inc. v. Thenen,* 975 F. Supp. 1468, 1472 (S.D. Fla. 1997) (explaining that "[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results").

Here, Class Counsel faced highly skilled counsel who aggressively defended the Action and increased the complexity of the case.  The factual discovery included hours spent reviewing Merrill's records, days of depositions and combating Merrill's efforts to slow discovery and delay the trial.  Class Counsel's firms have just over 20 lawyers combined, yet faced formidable and sophisticated opposition from a 1,900-plus lawyer firm, Morgan Lewis & Bockius.  Morgan Lewis' ERISA litigation department alone is comprised of more than 30 lawyers.  In this Action, Morgan Lewis created a team of lawyers from at least four offices.  The team was led by Brian Ortelere, ranked by *Chambers & Partners* as among the top three ERISA litigators in the country.

At the class certification phase, counsel for Merrill did not challenge the adequacy of Class Counsel's representation of the Class.  Class Counsel has extensive experience and expertise in complex litigation proceedings and class actions throughout the United States, and was amply qualified to conduct this litigation.  Class Counsel maximized the particular strengths and experience of each member of the team to prosecute the Action efficiently and effectively.  The fact that Class Counsel achieved this Settlement for the Settlement Class in

the face of substantial opposition by skilled and well-funded lawyers further evidences the quality of their work. (*See* Gilbert Decl. ¶ 53-54; Fitzpatrick Decl. ¶ 22).

**6.      Preclusion from other employment and time limits imposed justify the requested fee**

The <u>fourth</u> and <u>seventh factors</u> — preclusion of other employment and time limitations imposed — also support the reasonableness of Class Counsel's fee request. (Gilbert Decl. ¶¶ 55, 58-63).

This Action represented a significant allotment of resources by Class Counsel. (*See* Class Counsel Jt. Decl. ¶ 11). The prosecution of this case on a contingency fee basis precluded Class Counsel from taking other, hourly employment. (*See id.* ¶ 12). The case required an even more significant allotment of resources by the RTN firm, which has just five lawyers. (*See id.* ¶ 13). Although RTN's lawyers practice primarily on a contingency fee basis, the amount of time required to prosecute this case deprived them of working on other such cases. (*See id.*).

The efforts and resources allotted to this case were necessary given the time limits imposed. From the time this Court denied Merrill's motion to dismiss on August 1, 2016 to the discovery deadline on March 3, 2017, Class Counsel scoured 6½ years of Merrill's RCMA 05 documentation, Merrill's complex spreadsheets and remediation procedure documentation, as well as the LAAD Plans' account statements and a randomly selected sample of other class members' account statements to confirm the existence of a shortfall and deficiencies in remediation methodology. Class Counsel continued with expert-related discovery before the case settled at the eve of the June 6, 2017 trial date.

**7.      Class Counsel and Plaintiffs have a unique and longstanding professional relationship**

The <u>eleventh factor</u> examines the nature and the length of counsel's relationship with

Case No. 15-22782-cv-MGC

the client.  Somewhat uniquely in the context of a class action, Plaintiffs and their company LAAD are longstanding clients of the RTN firm in non-class-related matters.  (Class Counsel Decl. ¶ 16).  Suspecting a shortfall in the remediation, Plaintiffs brought the issue to their lawyers at RTN to examine.  Within two years, Class Counsel had diagnosed the issues, pursued the claims and negotiated a settlement making Plaintiffs and the Class more than whole.

### 8. The requested fee award is consistent with customary fees and awards in similar cases

The <u>fifth factor</u> and <u>twelfth factor</u>, the customary fee and awards in similar cases, also support approval of the fee award.  Courts within this Circuit have awarded attorneys' fees in excess of or approaching 35% of the gross settlement fund.  *See, e.g., Barba v. Shire U.S., Inc.*, No. 13-cv-21158, at 11 (S.D. Fla. Dec. 2, 2016) (awarding attorneys' fees of 35% of the settlement fund in a consumer protection class action where the litigation was "very hard fought," complex, and required a considerable amount of effort); *Waters v. Cook's Pest Control, Inc.*, No. 2:07-00394, 2012 WL 2923542, at *17-19 (N.D. Ala. Jul. 17, 2012) (awarding fees of 35% in a Title VII class action based on the complexities of the case, including complex discovery issues, where "defense counsel presented a vigorous defense at every stage of the case, requiring multiple hearings on motions to quash and motions for protective orders"); *see also Stephens v. US Airways Group, Inc.*, 102 F. Supp. 3d 222, 230-31 (D.D.C. 2015) (awarding 38% of the settlement fund in an ERISA class action where the case was highly complex and class counsel "achieved an excellent recovery for class members"); *In re U.S. Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir.2002) (affirming award to class counsel of 36% of settlement fund where counsel "obtained significant monetary relief on behalf of the class"); *Soto v. The Gallup Org., Inc.*, No. 13-cv-61747, at *8 (Nov. 24, 2015)

31

(Cooke, J.) (awarding 1/3 of $12 million settlement); *Reyes v. AT&T Mobility Servs., LLC*, No. 10-20837, at *6 (Cooke, J.) (awarding 1/3 of the total maximum settlement fund, noting that the award was consistent with the trend in this Circuit); *Gutter v. E.I. Dupont De Nemours & Co.*, No. 95-2152 (S.D. Fla. May 30, 2003) (awarding fees of 33 1/3% of settlement of $77.5 million); *In re: Terazosin Hydrochloride Antitrust Litigation*, No. 99-1317 (S.D. Fla. Apr. 19, 2005) (awarding fees of 33 1/3% of settlement of over $30 million). Indeed, the Eleventh Circuit in *Camden I* held that "an upper limit of 50% may be stated as a general rule, although even larger percentages have been awarded." 946 F.2d at 774-75.

Moreover, an empirical study conducted by Professor Fitzpatrick shows that nearly half of all fee awards in the Eleventh Circuit from 2006 to 2007 fell within the same 30% to 35% range as the award sought in this case. (Fitzpatrick Decl. ¶ 16). He cites to another study finding that the Eleventh Circuit featured a median fee award of 33% from 2009 to 2013. (*See id.* ¶ 16 n.1 (citing Eisenberg, Miller & Germano, *Attorneys' Fees in Class Actions: 2009-2013, available at* https://papers.ssrn.com/sol3/_papers.cfm?abstract_id=2904194, at 12). Professor Fitzpatrick opines that the facts and circumstances in this case reveal a much-better-than-typical settlement warranting a better-than-typical fee. (*See id.* ¶ 16; *see also* Gilbert Decl. ¶ 69).

In sum, *each* of the factors outlined in *Camden I* supports Class Counsel's request for approval of attorneys' fees equal to 35% of the Settlement Amount.

## VI.   THE REQUESTS FOR REIMBURSEMENT OF EXPENSES AND FOR AN INCENTIVE AWARD SHOULD BE GRANTED

Class Counsel requests that the Court grant reimbursement of $222,976.11 in litigation costs and expenses incurred by them in connection with the prosecution of this Action. (*See* Class Counsel Decl. ¶ 11). Courts routinely note that counsel is entitled to

reimbursement from the common fund for reasonable litigation expenses.  *See, e.g., In re Checking Account Overdraft Litig.*, No. 1:09-02036, 2015 WL 12641970, at *18 (S.D. Fla. May 22, 2015); *Gevaerts*, 2015 WL 6751061, at *14.   Class Counsel further submit that these expenses, which include costs such as mediation fees, expert witness fees, electronic legal research, court reporters, deposition transcripts, process servers, photocopying, postage and travel expenses, were necessarily incurred in furtherance of the litigation and should therefore be reimbursed from the Gross Settlement Fund.  *See, e.g., In re Checking Account Overdraft Litig.*, 2015 WL 12641970, at *18 (granting request for expenses of $976,191.34 from the settlement fund, where the expenses included expert fees, court reporter fees and transcripts, and mediator fees, which "were necessarily incurred in furtherance of the litigation of the Action and the Settlement").   They include significant expert witness fees totaling  more than $125,000.  (*See* Class Counsel Jt. Decl. ¶ 11).  Plaintiffs' expert witness Alan Spies is a quantitative analyst who analyzed enormous amounts of data from Merrill's databases and provided testimony at deposition and at the class certification hearing regarding methods to ascertain class members and quantify class damages.  Expert witness Jack Duval provided critical testimony at deposition and at the class certification hearing about the various share classes, the nature of sales charges for such share classes, industry standards of conduct relating to mutual fund fees, and what constituted "profit."

To date, no Settlement Class Member has objected to the request for reimbursement of expenses set forth in the Notice.

Additionally, Plaintiffs request an incentive award or "Case Contribution Fee" in the aggregate amount of $150,000 for their extraordinarily successful representation of the Settlement Class.   Service awards "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."

*Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006).  Indeed, "[p]rivate class action suits are a primary weapon in the enforcement of laws designed for the protection of the public." *Wilson*, 2016 WL 457011, at *15.  Accordingly, courts have "consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1357.  The factors for determining a service award include: (1) the actions the class representatives took to protect the interests of the class; (2) the degree to which the class benefited from those actions; and (3) the amount of time and effort the class representatives expended in pursuing the litigation.  *See id.*

Here, the results in this case warrant a significant Case Contribution Fee. (Fitzpatrick Decl. at 15-16; Gilbert Decl. at 15-17).  Plaintiffs have never before served as class representatives.  Before attempting to proceed on a class basis, Plaintiffs asked Merrill to provide an accounting of the Remediation payments made to the LAAD Plans, but Merrill refused.  As fiduciaries to their own retirement plans, they nevertheless felt compelled to bring the action, and did not sit on the sidelines and watch. (Fernandez Decl. ¶ 5).  Plaintiffs undertook the daunting task of challenging a nationwide remediation made by a large financial services firm.  (*See id.*).  They actively participated in the formulation and prosecution the action.  (*See id.* ¶ 8).  Plaintiffs were the only trustees of a RCMA 05 small business retirement plan to bring a claim relating to — or even raising questions about — the issues that have resulted in the Settlement.  (*See id.* ¶ 7).  When Plaintiffs received Merrill's original remediation payments and credits, Plaintiffs questioned the nature of those payments and their amounts.  (*See id.* ¶¶ 3-4).  Plaintiffs brought the issue to the attention of Class Counsel.  (*See id.* ¶ 4).  Plaintiffs monitored and actively participated in the lawsuit, and all three were deposed.  (*See id.* ¶ 8).  Each traveled to Atlanta to attend at least one of the two mediation sessions, paying their own way, and each had helpful input into the settlement negotiation strategy.  (*See id.*).

For these reasons, a Case Contribution Fee to Plaintiffs in their capacity as trustees of the LAAD Plans, in the amounts requested, has clearly been earned.

## VII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court (1) grant Final Approval of the Settlement; (2) certify for final settlement purposes the Settlement Class; (3) appoint Benjamin Fernandez, Gustavo Martinez and Oscar Luzuriaga, as trustees of and on behalf of the LAAD Retirement Plan and as trustees of and on behalf of the LAAD Corporation S.A. Money Purchase Retirement Plan, to be representatives of the Settlement Class; (4) appoint Class Counsel as counsel for the Settlement Class; (5) award Class Counsel attorneys' fees in the amount of $8.75 million; (6) reimburse Class Counsel's expenses in the amount of at least $222,976.11; (7) award Plaintiffs a Case Contribution Fee in the total amount of $150,000; and (8) enter Final Judgment dismissing the Action with prejudice, as well as any other or further relief the Court deems necessary or proper.

Respectfully submitted,

By: /s/ Jason Kellogg
Lawrence A. Kellogg, P.A.
Florida Bar No. 328601
Primary email: lak@lklsg.com
Jason Kellogg, Esq.
Florida Bar No. 0578401
Primary email: jk@lklsg.com
Victoria J. Wilson
Primary email: vjw@lklsg.com
Florida Bar No. 0578401
Levine Kellogg Lehman
Schneider + Grossman LLP
201 South Biscayne Boulevard, 22nd Floor
Miami, FL 33131
Telephone:  (305) 403-8788
Facsimile:  (305) 403-8789

Frank R. Rodriguez
Florida Bar No. 348988
Primary email: frr@rtgn-law.com
Paulino A. Núñez Jr.
Florida Bar No. 814806
Primary email: pan@rtgn-law.com
RODRIGUEZ TRAMONT & NUÑEZ P.A.
255 Alhambra Circle, Suite 1150
Coral Gables, FL 33134
Telephone: (305) 350-2300
Facsimile: (305) 350-2525

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 28, 2017, I served the foregoing to all counsel of record via CM/ECF.

/s/ Jason Kellogg
Jason Kellogg

Case No. 15-22782-cv-MGC

## SERVICE LIST

Carol A. Field
E-mail: cfield@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
200 S. Biscayne Boulevard, Suite 5300
Miami, FL 33131
Telephone: 305.415.3409
Facsimile: 305.415.3001

Brian T. Ortelere (admitted *pro hac vice*)
E-mail: bortelere@morganlewis.com
1701 Market Street |
Philadelphia, PA 19103-2921
Telephone: (215) 963-5150

Donald L. Havermann (admitted *pro hac vice*)
E-mail: dhavermann@morganlewis.com
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 739-5072

David I. Monteiro (admitted *pro hac vice)*
E-mail: dmonteiro@morganlewis.com
1717 Main Street, Suite 3200
Dallas, TX 75201-7347
Tel: (214) 466-4133

*Counsel for Defendant*