# Exhibit 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

*Fernandez et al. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*

## DECLARATION OF BRIAN T. FITZPATRICK

I.  Background and qualifications

1.        My name is Brian Fitzpatrick and I am a Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from the University of Notre Dame in 1997 and Harvard Law School in 2000.  After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP.  My C.V. is attached as Appendix 1.

2.        Like my research at New York University before it, my teaching and research at Vanderbilt have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, Complex Litigation, and Comparative Class Actions courses at Vanderbilt.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, the Vanderbilt Law Review, the NYU Journal of Law & Business, and the University of Arizona Law Review.  My work has been cited by numerous courts, scholars, and media outlets such as the New York Times, USA Today, and Wall Street Journal.  I have also been invited to speak at symposia and other events about class action litigation, such as the ABA National Institute on Class Actions in 2011, 2015, 2016, and 2017, and the ABA Annual Meeting in 2012.  Since 2010, I have also served on the

1

Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies.  In 2015, I was elected to the American Law Institute.

3.       In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study").  Unlike other studies of class actions, which have been limited to certain subject areas or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study sought to examine *every* class action settlement approved by a federal court over a two-year period, 2006-2007.  *See id.* at 812-13.  As such, not only is my study not biased toward particular settlements, but the number of settlements included in my study is several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 54 from the Eleventh Circuit alone.  *See id.* at 817.  This study has been relied upon by a number of courts, scholars, and testifying experts.  *See, e.g., Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (relying on article to assess fees); *Good v. W. Virginia-Am. Water Co.,* 2017 WL 2884535, at *23, *27 (S.D.W. Va. July 6, 2017) (same); *McGreevy v. Life Alert Emergency Response, Inc.*, 2017 WL 1534452, at *3 (S.D.N.Y. Apr. 28, 2017) (same); *Brown v. Rita's Water Ice Franchise Co. LLC*, 2017 WL 1021025, at *9 (E.D. Pa. Mar. 16, 2017) (same); *In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *7 (D. Kan. July 29, 2016) (same); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 1629349, at * 17 (S.D.N.Y. Apr. 24, 2016) (same); *In re Pool Products Distribution Mkt. Antitrust Litig.*, 2015 WL 4528880, at *19-20 (E.D. La. July 27, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 2147679, at *2-4 (N.D. Ill. May 6, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 1399367, at *3-5 (N.D.

Ill. Mar. 23, 2015) (same); *In re Capital One Tel. Consumer Prot. Act Litig.*, 2015 WL 605203, at *12 (N.D. Ill. Feb. 12, 2015) (same); *In re Neurontin Marketing and Sales Practices Litigation*, 2014 WL 5810625, at *3 (D. Mass. Nov. 10, 2014) (same); *Tennille v. W. Union Co.*, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (same); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F.Supp.3d 344, 349-51 (S.D.N.Y. 2014) (same); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F.Supp.2d 437, 444-46 & n.8 (E.D.N.Y. 2014) (same); *In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation*, 4 F.Supp.3d 94, 111-12 (D.D.C. 2013) (same); *In re Vioxx Products Liability Litigation*, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litigation*, 953 F.Supp.2d 82, 98-99 (D.D.C. 2013) (same); *In re Southeastern Milk Antitrust Litigation*, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

4.      I have been asked by class counsel to opine on whether the attorneys' fees and class representative payments they have requested are reasonable in light of my study and the other empirical studies on class action fees. In order to formulate my opinion, I reviewed a number of documents provided to me by class counsel; I have attached a list of these documents (and noted how I refer to these documents herein) in Appendix 2. As I explain, based on my study of settlements across the country and in the Eleventh Circuit in particular, I believe the fees and payments requested here are reasonable.

II.  Case background

5.       This lawsuit alleges that the defendant violated the federal Employee Retirement

Income Security Act of 1974 ("ERISA") by failing to secure fee waivers for mutual fund purchases

in its small business retirement accounts.  Although the defendant later promised to refund some

of these fees in an agreement with the Financial Industry Regulatory Authority ("FINRA"), the

lawsuit here contends that the refunds were insufficient to make the retirement accounts whole.

This lawsuit seeks full and complete refunds as well as disgorgement of the profits the defendant

reaped from the improper fees.  The lawsuit was filed in June 2015, but the parties have now settled

and are seeking certification of a settlement class.  The court preliminarily certified the settlement

class and preliminarily approved the settlement on October 13, 2017.

6.       The settlement class consists of all persons who served as trustees between January

1, 2006, and July 13, 2012, for small business retirement accounts (known to the defendant as

"RCMA 05 Accounts") that received or should have received the aforementioned refunds.  *See*

Settlement Agreement § 2.1 and Ex. D thereto.  The class will release the defendant from "any and

all Claims . . . that were or could have been pleaded in the Complaint . . . based on the same factual

predicate, including . . . any Claims relating directly or indirectly to the fees and sales charges

charged to RCMA 05 Accounts and profits and revenues arising therefrom." *See id*. at § 1.38.  In

exchange for this release, the defendant will pay the class $25 million in cash as well as all costs

associated with notifying the class and administering the settlement. *See id*. at §§ 1.42, 3.2, 4.5.

From the cash amount, class members will be paid 100% of the refunds they are due from the

defendant (which totals to approximately $9 million, including interest) plus a *pro rata* share of

the remaining settlement fund after attorneys' fees and service awards to the representative class

members are paid.  *See id.* at §§ 9.1-9.2.  Because these payments can be calculated from the defendant's records, class members will be paid by direct deposits to their accounts or by directly-mailed check; class members will not have to fill out any claim forms.  *See id.* at §§ 4.1(h), 4.2(d)-(e).  If any checks remain uncashed after two mailings, those monies will escheat to the respective state governments; none of the money will revert back to the defendant.  *See id.* at § 4.3.

7.      The parties are now moving for final approval of the settlement and class counsel are moving for an award of fees equal to $8.75 million from the settlement fund.  Based on my study of class action settlements across the country and in the Eleventh Circuit in particular—where the median fee award is at least 30%—it is my opinion that the fee request is reasonable. Class counsel are also moving for service awards to the class representatives, as trustees of the LAAD retirement plans, of $150,000 in the aggregate.  Again, based on my study of class action settlements across the country, it is my opinion that this request, too, would be reasonable.

III. Assessment of the reasonableness of the request for attorneys' fees

8.      At one time, courts that awarded fees in class action cases did so using the familiar "lodestar" approach.  *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043, 2051 (2010) (hereinafter "Class Action Lawyers").  Under this approach, courts awarded class counsel a fee equal to the number of hours they worked on the case (to the extent the hours were reasonable), multiplied by a reasonable hourly rate as well as by a discretionary multiplier that courts often based on the risk of non-recovery and other factors.  *See id.*  Over time, however, the lodestar approach fell out of favor in class actions.  It did so largely for two reasons. First, courts came to dislike the lodestar method because it was difficult to calculate the lodestar; courts had to review voluminous time records and the like.  Second—and more importantly—

courts came to dislike the lodestar method because it did not align the interests of class counsel with the interests of the class; class counsel's recovery did not depend on how much the class recovered, but, rather, on how many hours could be spent on the case. *See id.* at 2051-52. According to my empirical study, the lodestar method is now used to award fees in only a small percentage of class action cases, usually those involving fee-shifting statutes or those where the relief is predominantly injunctive in nature (and the value of the injunction cannot be reliably calculated). *See* Fitzpatrick, *Empirical Study, supra*, at 832 (finding the lodestar method used in only 12% of settlements).

9.      The more popular method of calculating attorneys' fees today is known as the "percentage" method. Under this approach, courts select a percentage that they believe is fair to class counsel, multiply the settlement amount by that percentage, and then award class counsel the resulting product. The percentage approach became popular precisely because it corrected the deficiencies of the lodestar method: it is less cumbersome to calculate, and, more importantly, it aligns the interests of class counsel with the interests of the class because the more the class recovers, the more class counsel recovers. *See* Fitzpatrick, *Class Action Lawyers, supra,* at 2052.

10.      In light of the well-recognized disadvantages of the lodestar method and the well-recognized advantages of the percentage method, it is my opinion that courts should generally use the percentage method whenever the value of the settlement can be reliably calculated and the lodestar method is not required by a fee-shifting statute. Only where the value of the settlement cannot be reliably calculated (and the percentage method is therefore not feasible) or a fee-shifting statute is applicable is it my opinion that courts should use the lodestar method. This is not just my opinion. It is the consensus opinion of class action scholars. *See* American Law Institute,

Principles of the Law of Aggregate Litigation § 3.13(b) (2010) ("[A] percentage-of-the-fund approach should be the method utilized in most common-fund cases.").

11.     In this case, the settlement can obviously be reliably valued—it is in cash—and therefore the percentage method should be used.   Indeed, the percentage method has been mandated by the Eleventh Circuit in these circumstances.   *See Camden Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) ("Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund . . . .").   As such, I will assess the reasonableness of the fee requests here using the percentage method.

12.     Under the percentage method, courts must 1) calculate the value of the benefits created by class counsel and then 2) select a percentage of that value to award to class counsel. When calculating the value of the benefits, in my opinion courts should include any cash compensation to class members, cash the defendant must pay to third parties, non-cash benefits that can be reliably valued, attorneys' fees and expenses, and administrative costs paid by the defendant; although some of these things do not go directly to the class as compensation, they either facilitate compensation to the class or serve to deter defendants from future misconduct by making defendants pay more when they cause harm.   *See, e.g.*, *In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation*, 851 F.Supp.2d 1040, 1080 (S.D. Tex. 2012) (including these items in the denominator of the percentage method).   When selecting what percentage to award class counsel, in my opinion courts should hypothesize what class members would have been willing to pay class counsel at the outset of the litigation in order to induce them to take the case, *see, e.g., Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("When attorney's fees are deducted from class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys."), but that is not the

Eleventh Circuit's approach.  In the Eleventh Circuit, courts start with 25% as the "'bench mark' percentage fee award" and then adjust it upward or downward "in accordance with the individual circumstances of each case." *Camden I*, 946 F.2d at 775.  Although "[t]he factors which will impact upon the appropriate percentage . . . in any particular case will undoubtedly vary," the Eleventh Circuit has identified sixteen factors that it has said may be "appropriate[]" or "pertinent" to consider. *Camden I*, 946 F.2d at 775.  These factors include "[1] the time required to reach a settlement, [2] whether there are any substantial objections . . ., [3] any non-monetary benefits conferred upon the class . . ., and [4] the economics involved in prosecuting a class action," *id.*, as well as the twelve factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974): "[5] the time and labor required; [6] the novelty and difficulty of the questions involved; [7] the skill requisite to perform the legal service properly; [8] the preclusion of other employment by the attorney due to acceptance of the case; [9] the customary fee; [10] whether the fee is fixed or contingent; [11] time limitations imposed by the client or the circumstances; [12] the amount involved and the results obtained; [13] the experience, reputation, and ability of the attorneys; [14] the 'undesirability' of the case; [15] the nature and length of the professional relationship with the client; [and] [16] awards in similar cases." *Camden I*, 946 F.2d at 772 n.3. In this declaration, I will follow the Eleventh Circuit's approach and try to situate this case relative to others within the Eleventh Circuit's factors in light of my empirical study and other empirical studies.

13.     The first step under the percentage method is to calculate the value of the benefits created by class counsel.  This is very easy in this case: the benefits are the $25 million cash settlement fund and whatever it costs to notify the class and administer the settlement.  Thus, the benefits to the class are *over $25 million.*

14.     The second step of the percentage method is to select the percentage. Class counsel are seeking fees of $8.75 million; this is *less than 35%* of the aforementioned benefits they have conferred on the class—how much less depends on how much the defendants spend on notice and settlement administration. (In many settlements, these things are paid *from* the settlement fund as opposed to *on top* of the settlement fund as they are here.) In light of my and other empirical studies as well as the Eleventh Circuit's factors, it is my opinion that it would be reasonable to award class counsel these fees.

15.     Consider first the factors that go to the fee awards in other cases: "[9] the customary fee" and "[16] awards in similar cases." It is true that the fee request here is higher than the typical class action fee award. According to my empirical study, the most common percentages awarded nationwide were 25%, 30%, and 33%, with the average at 25.4% and the median at 25%. *See* Fitzpatrick, *Empirical Study, supra*, at 833. But courts were not hesitant to award fees above 33% when the facts and circumstances justified it. Indeed, the highest fee award in my study was 47%. *See id.* These numbers agree with the other large-scale academic study of fee awards in class actions. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 260 (2010) (finding a mean of 24% and a median of 25%).

16.     Fee awards are even higher in the Eleventh Circuit. According to my empirical study, there were 35 class action cases in 2006 and 2007 in which district courts in the Eleventh Circuit used the percentage method to award attorneys' fees. *See* Fitzpatrick, *Empirical Study, supra*, at 836. The average fee awarded in these cases was 28.1% and the median fee awarded was 30%.[1] *See id.* Again, when the facts and circumstances justified it, courts in the Eleventh Circuit

---

[1] The Eisenberg-Miller study found mean and median fee awards in the Eleventh Circuit somewhat lower than those

were not hesitant to award fees above that.  This can be seen clearly from Figure 1, which shows the distribution of all of the Eleventh Circuit percentage-method fee awards in my study.  In particular, the figure shows what fraction of fee awards (y-axis) fell within each five-point range of fee percentages (x-axis).  Each bar includes the data point on its left most edge; thus, for example, the bar between 25% and 30% includes awards of 25% but not 30%.  As the figure shows, *nearly half* (i.e., .5) of all Eleventh Circuit fee awards were in the *same 30%-to-35% range sought in this case*.  Thus, although the request here is better than typical, it is hardly unprecedented.  Indeed, as I explain below, the facts and circumstances of this case indicate that this is a *much better* than typical class action settlement; as such, it would be reasonable to award class counsel a better-than-typical fee award.

---

found in my study: 21% and 22%, respectively.  *See* Eisenberg & Miller, supra, at 260.  It should be noted, however, that their study was based on settlements dating back to 1993, and, as such, their data are older than mine.  Moreover, their study examined only a fraction of the settlements over this period, and the fraction examined was not designed to be representative of the whole.  *See id.* at 253 ("[O]ur data include only opinions that were published in some readily available form.  Obviously, therefore, we have not included the full universe of cases . . . . [P]ublished opinions are not necessarily representative of the universe of all cases.").  In particular, one of the reasons their study may have found lower numbers than mine is because it oversampled larger cases (where the fee percentages awarded are often smaller than in other cases).  *See* Fitzpatrick, *Empirical Study, supra*, at 829 (discussing the unrepresentative sampling in the Eisenberg-Miller studies).  In this regard it should be noted that, in an update to their study (which has not yet been published), Professor Miller and new co-authors (Professor Eisenberg passed away) examined more recent years (2009-2013) and more representative settlements (because the electronic databases have become more complete) and came to numbers closer—and *even higher*—than the ones I found.  *See* Ted Eisenberg, Geoff Miller & Roy Germano, *Attorneys'   Fees   in   Class   Actions:   2009-2013,   available   at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2904194, p. 12 (finding mean fee award of 30% and median of 33% in the Eleventh Circuit).

**Figure 1: Percentage-method fee awards in the Eleventh Circuit, 2006-2007**



17.     Consider next the factors that go to the results obtained by class counsel in light of the risks class counsel faced: "[4] the economics involved in prosecuting a class action," "[6] the novelty and difficulty of the questions involved," "[10] whether the fee is fixed or contingent," "[12] the amount involved and the results obtained," and "[14] the 'undesirability' of the case." The results here are incredible: this is the extremely rare case where the settlement recovers *more than 100% of the class's damages*. According to class counsel, the class's damages (including interest) are approximately $9 million; yet settlement recovers over $25 million—almost three times the class's damages. I am not aware of any class action settlement that has recovered so much more than the class's damages.[2] It is true that class counsel were able to construct such a

---

[2] The best studies of class member recoveries come from securities fraud cases. *See, e.g., Recent Trends in Securities Class Action Litigation: 2014 Full-Year Review, available at*

11

rich settlement because ERISA permits plaintiffs to recover disgorgement of profits in addition to compensatory damages. According to class counsel, the most the class might have received at trial including disgorgement was some $43.8 million; the settlement is thus 57% of the total theoretical statutory recovery if everything went the class's way. But many statutes provide for extra-compensatory damages like this—such as the trebling of damages under the antitrust and racketeering laws—yet it is very rare for class settlements to recover even single damages under such statutes let alone a multiple. *See* John M. Connor & Robert H. Lande, *Not Treble Damages: Cartel Recoveries Are Mostly Less Than Single Damages*, 100 Iowa L. Rev. 1997 (2015) (finding that only 20% of private antitrust cartel cases between 1990 and 2014 recovered even single damages let alone multiple damages).

18.     The recovery here looks even better when compared to the risks that class counsel faced. To begin with, the defendant argued that the representative plaintiffs here did not have standing to sue on behalf of many of the class members because their retirement accounts did not purchase the same mutual funds. Moreover, the defendant argued that it did not even have a fiduciary duty to the class members to request fee waivers on their mutual fund purchases. In addition, the defendant argued that many of the claims here were outside the statute of limitations. If the defendant had prevailed on any of these arguments, the class might have been left with little to nothing. Finally, the defendant hotly contested plaintiffs' disgorgement calculations, arguing that it earned only $700,000 in profits on the improper mutual fund fees, not the $34.8 million the plaintiffs contended. Even if the class had prevailed on all of these matters at summary judgment *and* at trial, the defendant no doubt would have taken an appeal, introducing even more risk.

---

http://www.nera.com/content/dam/nera/publications/2015/PUB_2014_Trends_0115.pdf at 9, 33 (finding that the median securities fraud class action between 1996 and 2015 settled for between 1.3% and 7.0% of a measure of investor losses, depending on the year).

Recovering more than 100% of the class's compensatory damages in these circumstances—and 57% the total theoretically possible statutory damages!—is remarkable.

19.     Indeed, if there were any doubt that this was a difficult case, consider that, despite thousands of class members, this was the only lawsuit filed against the defendant for this alleged misconduct.  Not even FINRA discovered the defendant's alleged refund mistakes, nor did it do anything remedy them even when class counsel exposed them.  Why not?  To begin with, the defendant's alleged misconduct was difficult to detect and only the class representatives and class counsel figured it out.  But even apart from the difficulty of detection, no one followed class counsel into the breach—not FINRA, not another law firm—because, as I noted above, this was a very risky case.  It was not at all clear the defendant owed any money at all to the class, let alone more than it had already refunded.  In other words, this is not a case where class counsel piggybacked on the work of the government, nor is this a case where dozens of firms filed competing class actions all hoping to be appointed class counsel.  No one else detected the underlying misconduct and no one else wanted to try to remedy it even when it was discovered. This confirms in my mind that class counsel's work here has been extraordinary—and therefore deserving of an extraordinary fee award.

20.     Consider next the factor "[3] any non-monetary benefits conferred upon the class." Although the settlement does not include an injunction obligating the defendant to secure mutual fund fee waivers in the future for class members' accounts, that is only because the defendant already transitioned those accounts to a platform that ensures they will not be charged the improper mutual fund fees in the future.  Moreover, most class action settlements do not include non-monetary benefits.  See Fitzpatrick, *Empirical Study, supra*, at 824 (finding that only one quarter of class action settlements include injunctive relief).  Thus, although this factor may not be reason

to boost class counsel's fee award even further than the risk-recovery factors suggest above, it is also not reason to reduce it.

21.     Consider next the factors that go to the time it took to litigate and resolve these lawsuits: "[1] the time required to reach a settlement" and "[5] the time and labor required." This case has transpired almost as long as the typical class action case does before it reaches settlement. *See* Fitzpatrick, *Empirical Study, supra*, at 820 (finding average and median times to final settlement approval of around three years). Yet, class counsel have accomplished a great deal during that time: they thwarted the defendant's motion to dismiss, reviewed 125,000 pages of documents, deposed five witnesses, defended six depositions, and spent countless hours with their own experts to figure out the defendant's complex scheme. As such, these factors, too, weigh in favor of class counsel's fee request.[3]

22.     Consider finally the other *Camden* factors. One of these factors is inapplicable at least as of yet—"[2] whether there are any substantial objections"—because the deadline for objection as not yet passed, but the other factors go to the skills of class counsel and their relationship with the plaintiffs: "[7] the skill requisite to perform the legal service properly," "[8]

---

[3] Some courts perform a so-called "lodestar crosscheck" pursuant to the time-and-labor factor and compare class counsel's lodestar to the amount of fees class counsel would reap from the percentage method. But many courts do not undertake this crosscheck, and it is my opinion that courts should not do it. I say this because the lodestar crosscheck reintroduces the very same undesirable consequences of the lodestar method that the percentage method was designed to correct in the first place. In particular, if class counsel believe that courts will cap the percentage awarded at some multiple of their lodestar, then they will have precisely the same incentives they would if courts used the lodestar method alone: to be inefficient, perform unnecessary projects, delay results, and overbill and overstaff work in order to run up their lodestar. Moreover, by capping the amount of compensation class counsel can receive from a settlement, the lodestar crosscheck also misaligns class counsel's incentives from those of class members and blunts their incentive to achieve the largest possible award for the class. Consider the following example. Suppose a class action lawyer had incurred a lodestar of $1 million in a class action case. If that counsel believed that a court would not award him a 35% fee if it exceeded twice his lodestar, then he would be rationally indifferent between settling the case for $5.7 million and $57 million (or any number higher than $5.7 million). Although I am not suggesting that class counsel here would have been tempted in this way, the decisions courts make today set the expectations for class action lawyers tomorrow, and it is terrible public policy to create the expectation that the lodestar crosscheck will cap class counsel's fees under the percentage method.

14

the preclusion of other employment by the attorney due to acceptance of the case," "[11] time limitations imposed by the client or the circumstances," "[13] the experience, reputation, and ability of the attorneys," and "[15] the nature and length of the professional relationship with the client." Although I was not privy to the attorney-client relationships here, I understand from the declaration of Robert Gilbert—himself one of the most highly regarded class action lawyers in the United States—that class counsel include among their number the cream of Florida's class action bar. These are not mere "benchmark" lawyers.

23.     For all these reasons, I believe the fee award requested here is reasonable.


IV. Assessment of the reasonableness of the request for service awards

24.     Class counsel have sought service awards to the representative plaintiffs as trustees of the LAAD Plans in the amount of $150,000 in the aggregate. As I explain below, although the awards would be above average, in light of the active nature of the class representatives' work in this case, it is my opinion that the awards requested here would be reasonable.

25.     The best empirical study of service awards is the one from Eisenberg and Miller: *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 U.C.L.A. L. Rev. 1303 (2006). Professors Eisenberg and Miller examined 374 cases from 1992 to 2003 in state and federal court, and they found that the average and median service award per representative plaintiff was $15,991 and $4,357, respectively. *See id.* at 1321. In the aggregate, all the incentive awards in a case totaled to 0.16% of the class's recovery on average. *See id.* at 1339.

26.     The awards requested here total to $150,000—on average, $50,000 per trustee—or 0.6% of the settlement. These awards would be above the averages and medians in the Eisenberg-Miller study. But it is not uncommon in cases with institutional class representatives, who have

more to discover and who can assist the case in more meaningful ways than consumer or employee class representatives often can, to see courts award larger payments. *See, e.g., Marchbanks Truck Service, Inc. v. Comdata Network, Inc.*, No. 2:07-cv-01078 (E.D. Pa., July 14, 2014) (approving awards from $15,000 to $150,000 for class representatives who submitted employees to depositions, assisted in the investigation and development of the initial complaint, oversaw the prosecution of the litigation and settlement negotiations, travelled to and attended multiple court hearings, settlement conferences, and mediations, responded to numerous document requests and interrogatories); *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 2:12-md-02343 (E.D.Tenn., June 30, 2014) (awarding $50,000 awards for "sitting for depositions on both document production and merits issues and responding to document requests and interrogatories" as well as "participat[ing] in the settlement negotiations and attend[ing] the first Mediation Session").

27.     The class representatives in this case were much like the institutional representatives in these other cases. According to class counsel, they were the ones who identified the defendant's underpayments to begin with. They actively participated in the formulation of the complaint and prosecution of the action. All of them were deposed and each of them attended at least one of the two mediation sessions, and they were not idle during these sessions. In other words, the class representatives here were the type of active participants that have warranted above-average service awards in other cases. As such, it is my opinion that the awards requested are reasonable.

28.     My compensation in this matter has been $795 per hour.

Nashville, TN

November 27, 2017

Brian T. Fitzpatrick

# Appendix 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Professor*, 2012-present
- *FedEx Research Professor*, 2014-15; *Associate Professor*, 2010-12; *Assistant Professor*, 2007-10
- Classes: Civil Procedure, Federal Courts, Complex Litigation
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## ACADEMIC ARTICLES

*An Empirical Look at Compensation in Consumer Class Actions,* 11 NYU J. L. & BUS. 767 (2015) (with Robert Gilbert)

*The End of Class Actions?*, 57 ARIZ. L. REV. 161 (2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)

## BOOK CHAPTERS

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, 2016)

*Is the Future of Affirmative Action Race Neutral?* in A NATION OF WIDENING OPPORTUNITIES: THE CIVIL RIGHTS ACT AT 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, 2016)

## ACADEMIC PRESENTATIONS

*The Next Steps for Discovery Reform: Requester Pays,* Lawyers for Civil Justice Membership Meeting, Washington, DC (May 5, 2015)

*Private Attorney General: Good or Bad?*, 17th Annual Federalist Society Faculty Conference, Washington, DC (Jan. 3, 2015)

*Liberty, Judicial Independence, and Judicial Power*, Liberty Fund Conference, Santa Fe, NM (Nov. 13-16, 2014) (participant)

*The Economics of Objecting for All the Right Reasons,* 14th Annual Consumer Class Action Symposium, Tampa, Florida (Nov. 9, 2014)

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, New York (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, California (Apr. 13, 2014) (panelist)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, Florida (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law (Nov. 7-8, 2013)

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, Florida (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability, Corporate Law Center, Fordham Law School (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote*, University of Iowa Law School (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law (Apr. 3, 2007) (panelist)

**OTHER PUBLICATIONS**

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

## OTHER PRESENTATIONS

*The New Business of Law: Attorney Outsourcing, Legal Service Companies, and Commercial Litigation Funding*, Tennessee Bar Association, Nashville, TN (Nov. 12, 2014)

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club of Nashville (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

## PROFESSIONAL ASSOCIATIONS

Referee, Journal of Empirical Legal Studies
Reviewer, Oxford University Press

Reviewer, Supreme Court Economic Review
Member, American Law Institute
Member, American Bar Association
Fellow, American Bar Foundation
Member, Tennessee Advisory Committee to the U.S. Commission on Civil Rights, 2009-2015
Board of Directors, Tennessee Stonewall Bar Association
American Swiss Foundation Young Leaders' Conference, 2012
Bar Admission, District of Columbia

## COMMUNITY ACTIVITIES

Board of Directors, Nashville Ballet; Nashville Talking Library for the Blind, 2008-2009

# Appendix 2

Documents Reviewed:

- Defendant Merrill Lynch's Motion to Dismiss for Failure to State a Claim and Incorporated Memorandum of Law (document 17, filed 9/16/15)

- Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss (document 27, filed 10/15/15)

- Defendant Merrill Lynch's Reply Memorandum in Support of Motion to Dismiss for Failure to State a Claim (document 33, filed 11/4/15)

- Order Denying Defendant's Motion to Dismiss (document 49, filed 8/1/16)

- Defendant's Response in Opposition to Plaintiffs' Motion for Class Certification (document 68, filed 11/18/16)

- Plaintiffs' Reply in Support of Motion for Class Certification (document 80, filed 12/28/16)

- Plaintiffs' Unopposed Motion for (I) Preliminary Approval of Settlement Agreement, (II) Certification of the Class for Settlement Purposes, (III) Approval of Notice to the Class and (IV) Scheduling of a Fairness Hearing, and Incorporated Memorandum of Law (document 169, filed 6/8/17) and exhibits there to, including Settlement Agreement and Release ("Settlement Agreement")

- Report and Recommendation on Order Preliminarily Approving Settlement and Providing for Notice (document 175, filed 9/29/17)

- Order Adopting Magistrate Judge's Report and Recommendation (document 176, filed 10/13/17)

- Order Setting Fairness Hearing (document 177, filed 10/20/17)

- Plaintiff's Motion for Final Approval of Proposed Class Action Settlement and Plan of Allocation, Motion for Award of Attorneys'' Fees, Reimbursement of Expenses and Case Contribution Fee, and Incorporated Memorandum of Law (filed herewith)